**MOSS et al. v. ÆTNA LIFE INS. CO.**
No. 6511.

Circuit Court of Appeals, Sixth Circuit.
Nov. 7, 1934.

Scott Fitzhugh, of Memphis, Tenn. (W. W. Swift and Henry M. Crymes, both of Memphis, Tenn., on the brief), for appellants.

Benjamin Goodman, Jr., of Memphis, Tenn. (Walter P. Armstrong and Armstrong, McCadden & Allen, all of Memphis, Tenn., on the brief), for appellee.

Before MOORMAN, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The suit below was on three policies of life and double indemnity accident insurance brought by the beneficiary and assignee, and, from a judgment upon directed verdict for the defendant company, the plaintiffs appeal.

The company's defense, sustained by the court below, was that the policies lapsed without value for nonpayment of premiums prior to the death of the insured. Conceding default in the payment of premium last due on each of the three policies, the plaintiffs contend that the policies were nevertheless in full force and effect at the date of death, because the one month's notice required to be given that indebtedness on the policies equalled their loan value was given neither to the insured nor to the assignee; because the payment of premium, when due, was waived by the previous conduct of the company and its agent; and because there was sufficient reserve value in each of the policies

to carry it, in the form of extended insurance, beyond the death of the insured.

The policies were on the life of Robert J. Moss, deceased husband of the appellant Mary E. Moss. Moss died August 22, 1932, as the result of an accident which occurred August 17th of that year. He had three policies in the defendant company, two issued on July 12, 1918, for $2,000 and $3,000, respectively, and a third written in 1919 for $5,000. All three of the policies were twenty-payment life policies, with premiums payable annually, semiannually, or quarterly. The premiums for the last year became due on July 12, 1932, and the period of grace for their payment expired August 12th. Moss had borrowed upon the policies, and his unpaid loans, plus accumulated interest thereon, are claimed to have exhausted all of the reserve value remaining in the policies at the time of his death.

The contention of the plaintiff as to the requirement of notice is based upon article 13 of each policy. This provides that unpaid interest when due shall be added to the principal, and with respect to payment of the loan contains this provision: "Failure to pay any loan or interest due thereon will avoid this policy when the total indebtedness hereon to the company shall equal or exceed the loan value at the time of such failure, but not before that time, nor until one month after notice of the same has been mailed by the company to the last known address of the person to whom the loan was made and of the insured, and assignee if any." The company concedes that no notice under this paragraph was given, but contends that none was required, as the avoidance of the policies was due, not to the insured's failure to pay the loans, but to the lapse of the policies for nonpayment of premium; section 7 of the policies providing that, if any subsequent premium after the first is not paid when due, the policy shall cease, subject to the values and privileges thereinafter described, except that a grace of thirty-one days is allowed for the payment of any premium after the first.

 Provisions of policies touching loans similar to or identical with the one here considered have been construed in a number of the federal Judicial Circuits. It has uniformly been held that the loan and forfeiture provisions do not modify or in any way affect the avoidance of the policy for failure to pay premiums thereon. When there is a failure to pay a premium when it is due, the policy becomes void, except for the au-

tomatically extended insurance, but, where there is no reserve or loan value in the policy, it having been exhausted by the discharge of an indebtedness thereon, "the loan agreement and all its incidents * * * became non-existent—a chapter finished and closed." Hawthorne v. Bankers' Life Co., 63 F.(2d) 971, 972 (C. C. A. 8); Bach v. Western States Life Insurance Co., 51 F.(2d) 191, 192 (C. C. A. 10); Pacific Mutual Life Insurance Co. v. Davin, 5 F.(2d) 481 (C. C. A. 4); Minnesota Mut. Life Ins. Co. v. Cost, 72 F.(2d) 519 (C. C. A. 10). With this view we find ourselves in accord, notwithstanding the urgent insistence of the plaintiffs that we repudiate it. Under policies such as are here involved, the insured, by paying premiums for a number of years, builds up a reserve. As to such reserve he is given several options. He may take the reserve in cash, purchase extended insurance for a term, or purchase a paid-up policy for a limited amount. He cannot have both the cash and the extended insurance, or the cash and the paid-up policy, when the reserve is exhausted by a cash withdrawal. As was said in the Bach Case, supra, "This is contrary to the agreement of the parties, and no insurance company could exist that paid out its reserves twice."

The second complaint of the plaintiffs is of the exclusion of evidence introduced to establish waiver, based upon a course of conduct by the company estopping it from insisting upon timely payment of premiums. Since a very detailed statement of what the interdicted witnesses would testify to, if permitted, was made by counsel for the plaintiffs, it becomes necessary only in ascertaining error to consider whether the proffered testimony was sufficiently substantial to support a verdict of the jury in their favor on the basis of estoppel. The general agent of the company, Thomas M. Searles, sworn on behalf of the plaintiffs, had testified that he had had direct supervision of the company's business in the Memphis territory, and that his duties included notifying policyholders when their premiums were due, and granting extensions of payment under certain rules of the company. What the rules were did not appear, but, if premiums were not paid, or a partial payment made thereon, he had to make report. He further testified that he had had an arrangement with the insured over a period of ten years to the effect that, when Mr. Moss was out of town, he would protect his premiums. Inasmuch as it had already appeared that the insured had been in the city during the en-

tire period of grace and thereafter up to the time of death, the court excluded further testimony on the subject. It was at this point that counsel indicated that Searles and a corroborating witness would, if permitted, testify substantially as follows: That some ten years prior to his death Moss had made arrangements whereby, in the event that he did not pay his premiums when due or within the period of grace, the policies would not lapse or be forfeited; that on repeated occasions after this understanding was reached he had failed to pay premiums at their due date, but executed extension agreements after the expiration of the grace period which Searles dated back, so that they would appear to have been executed prior to the expiration of grace; that at such times Moss paid his premiums; that he had relied on this course of dealing; that there had been no notice to him prior to his death that this course would not be adhered to; that Searles had never informed him that such dealings were in any way in violation of the company's rules, or in excess of the agent's authority.

Viewing this testimony in the light most favorable to the plaintiffs, we fail to see in it such substantial character as is required to support a verdict for the plaintiffs based upon waiver. "In the absence of conduct creating an estoppel, a waiver must be supported by an agreement founded upon a valuable consideration. There can be no waiver unless so intended by one party and so understood by the other, but when a party has so acted as to mislead the other he is estopped thereby." Reynolds v. Detroit Fidelity & Surety Co., 19 F.(2d) 110, 113 (C. C. A. 6); Hasler v. West India S. S. Co., 212 F. 862, 867 (C. C. A. 2). It is clear that the waiver here asserted can be supported only by conduct creating an estoppel. The principle underlying the rule of estoppel is based upon acquiescence of the party against whom the estoppel is claimed to acts of the other party, who relies upon such acquiescence to his injury. It is elementary, however, that no estoppel arises by acquiescence in acts other than or different from the acts which the party claiming the estoppel alleges that he is entitled to commit by reason of such acquiescence. Passing the question as to whether the company had in the past accepted belated premiums only when the insured was out of the city at their due date, since the pleadings allege a less qualified consent and Searles was not permitted to complete his testimony, it is yet clear from the offered proof that, when in the past the insured had failed to pay his premiums when due, or within the grace period, they were accepted by the agent only upon the execution of an extension agreement. The importance to the company of such agreements in protecting itself against the fraud of its agents, in making definite the date when and the terms and conditions under which actual payment is to be made, is obvious. At any rate, there can be no question of the right of the company to attach reasonable conditions to its waiver of an express provision included in the policy for its benefit. A course of conduct, however, indicating acquiescence by the company in belated payments of premiums only upon execution of extension agreements, will not support an estoppel where no extension agreement was either executed or tendered. We hold, therefore, that the provision in the policy for the payment of premiums at their due date, or within the period of grace, was not waived, and that the company was not estopped from asserting its rights thereunder.

The third of the plaintiffs' major contentions is that the company computed the reserve value of the policies applied to the satisfaction of the insured's indebtedness thereon erroneously; that, properly computed, there was sufficient reserve value in each of the policies to carry it as extended insurance beyond the death of the insured. The basis for such contention is twofold: First, that the company failed to follow the rule set out in the policy as to the method of calculating the reserve in respect to deductions made by it for what is known as the surrender charge; second, that the company should have set up as a reserve for the insured so much of his annual premiums as were required to cover the accidental death hazard between the time when the premiums would cease and the time when double indemnity protection would expire.

Article 14 of the policies governs the computation of their reserve value and the surrender charges, and is as follows: "The value of this policy to be applied as hereinafter provided shall be the reserve hereon according to the American Experience Table of Mortality and three and one-half per cent interest, less a charge of not more than two and one-half per cent of the sum insured (which charge will gradually decrease and after the fourteenth policy year will in no case exceed one-twentieth of one per cent of the said sum insured) and less also any indebtedness to the company secured by this policy." The company decreased the surrender charge from year to year after the third year

the policy had been in force, but the steps by which such decrease was accomplished were neither equal nor uniform. It is contended that, in the phrase "which charge will gradually decrease," the term "gradually" means a decrease by equal or regularly progressive steps, and testimony was introduced to show that, if the surrender charge were thus decreased, there would remain in the policies reserve value sufficient to extend the policies for the few days that intervened between the expiration of the period of grace and the death of the insured. We doubt, however, that the term "gradually," either in common parlance or by dictionary definition, has such limited connotation. But, even if so, the insurance contract carried its own definition. Article 14 of the policies contains a table showing the nonforfeiting values computed at the end of completed policy years for $1,000 of the sum insured. It shows the period of extended term insurance available, the paid-up policy value, and the cash or loan value. That these sums are net is indicated by the recital "no deduction from these values will be made for a surrender charge." In Atlantic Life Insurance Co. v. Pharr, 59 F.(2d) 1024, we held similar tables to be controlling of a matter upon which the parties were free to contract, and that we could not alter the amounts stated or entitle the assured to a contract covering larger amounts. We see no reason to depart from the views there expressed.

█ Nor do we find any different answer to the contention that the tabulated reserve value should be increased by some proportion of the premiums collected to provide for the double indemnity provision of the policies. The reserve values set up at the end of each policy year are specific. There is no provision in the contract that the insured is entitled to any other or greater reserve value. That it was the practice of the company to build up a general reserve to cover that period which intervened between the insured's fulfillment of his contract and the age limit beyond which double indemnity protection was not afforded cannot change the terms of the policy.

█ One other contention must be noted. The company's records show that the policies lapsed as of August 26th. But these were routine clerical entries and a part of purely intra-company procedure. They cannot be construed as a waiver of payment, or as between the company and the insured or his beneficiary an abandonment of rights clearly defined by the contract.

The judgment below is affirmed.