# W. R. WEBB, JR. v. THE BOARD OF TRUSTEES OF WEBB SCHOOL et al.—271 S. W. (2d) 6.

Middle Section. April 29, 1954.

Rehearing denied May 21, 1954.

Petition for Certiorari denied by Supreme Court, Sept. 6, 1954.

174

Stockell, Rutherford & Crockett, of Nashville, Cooper & Cooper, and Ben Kingree, Jr., of Shelbyville, for complainant.

Bailey, Ewing & Powell, of Nashville, for defendants.

HOWELL, J. The bill in this case was filed on November 7, 1952, by W. R. Webb, Jr. of Bedford County, Tennessee, against the Board of Trustees of Webb School, a corporation organized and existing under the laws of the State of Tennessee, with its principal office and place of business in Bedford County, Tennessee, and also a number of individuals constituting the Board of Trustees of Webb School.

The principal prayer of the bill was that the Court declare the right of the complainant to continue as principal of Webb School under the provisions of the Charter of the School and the constitution of the Alumni Association and Former Students of Webb School.

After the case was put at issue by answers and other pleadings and hundreds of pages of testimony and exhibits were filed it was heard by the Honorable Robert E. Lee, Chancellor, and on September 12, 1953 the

Chancellor filed a lengthy opinion in which the facts were found in favor of the complainant and the prayers of the original bill were granted. It was held that the complainant was entitled to be restored to his status of Principal of Webb School when he has executed the necessary papers vesting in the defendant corporation a good title to the School property.

The opinion of the Chancellor goes fully into the controversy and determines all matters in dispute in a most able and thorough manner and is as follows:

"The bill in this cause was filed under the Declaratory Judgment Statute, Code Section 8835, et seq. Under these Code Provisions the complainant seeks to have his status determined and his legal relation to Webb School declared. For many years prior to 1926 complainant and his father, W. R. Webb, Sr., were co-principals of Webb School, then and now located at Bell Buckle, Bedford County, Tennessee. Since the death of Mr. W. R. Webb, Sr. in 1926, the complainant has been the principal of said school until he was removed by the Board of Trustees of Webb School and Mr. G. W. Follin appointed in his stead. The removal was by resolution adopted at a meeting of the Board of Trustees of Webb School held in Nashville, July 12, 1952.

It is alleged in the bill that the action of the Board of Trustees of Webb School (hereinafter referred to as the corporation) in removing complainant as principal of said school was illegal and void in that the corporation exceeded its charter powers in undertaking to remove complainant as principal of said school.

The answer of the corporation and a majority of its trustees avers that the complainant agreed in 1949 with the then president of said corporation, Frank C. Rand,

and in certain letters addressed to Mr. Rand, and in certain board meetings held thereafter, to relinquish his right to remain as principal of said school and manage and control its affairs.

It is averred that the complainant was placed on a salary as an employee of said corporation, in 1950, by action of its board, which action was agreed to by complainant; that complainant also agreed in September, 1950, that the corporation assume the financial direction and general management of school affairs; that at this time it was likewise agreed that the corporation would assume all outstanding indebtedness against the school and properly charged to it; that the complainant was at that time pleased with the action of the corporation in placing him on a salary and in relieving him of the responsibility of managing the school and looking after its business and financial affairs.

It is averred that in September, 1950, the school was in such poor financial condition that it could not have continued to operate without the financial assistance of the corporation; that complainant apparently realized this and agreed to being placed on a salary and for the corporation to take over the management, etc., as aforesaid.

It is further averred that pursuant to this agreement and understanding with complainant, the corporation made plans for the erection of new buildings on the school campus and went forward with renewed efforts to raise $500,000 for the use of the school; that in May, 1951, the corporation appointed a business manager; that in August, 1951, with the consent of the complainant the corporation voted to assume all outstanding obligations incurred by complainant prior to July 1, 1951, as agreed

to be just and fair between complainant and the finance committee of the corporation, upon complainant executing and delivering to the coropration proper deeds and other instruments waiving all claims he might have in the school property.

It is averred in the answer that complainant has accepted his retirement salary of $500 per month since 1952 and by his conduct has acquiesced in the action of the corporation in retiring him with the honorary title of Principal Emeritus.

Gov. Prentice Cooper and Messrs. Strother Simpson, D. C. Webb, Thompson Webb and Frank P. Barker, members of the Board of Trustees and defendants in this cause, filed their separate answers and in the main they agreed with the insistence of complainant that the corporation was without power or authority to retire complainant as principal of said school and to take away from him the complete control and management thereof.

At the hearing the defendant corporation and the majority of defendant trustees were permitted to file an amendment to their original answer in which it is averred that complainant made a speech to the alumni meeting held at Webb School on April 30, 1949, in which he remarked that he, W. R. Webb, would decide when he would retire as principal of Webb School; that this statement was at variance with the understanding and agreement between the complainant and the representatives of the corporation; that complainant's assertion resulted in a meeting with Mr. Frank C. Rand, at the latter's invitation, in St. Louis, on September 23, 1949,—the members of the building committee, complainant W. R. Webb, Jr., and defendant Mr. Follin being present at this meeting in Mr. Rand's office.

It is averred that at this meeting Mr. Rand, now deceased, asserted that complainant's statement in his alumni speech made April 30th, was at variance with the previous understanding between the complainant and the Board of Trustees; that complainant was informed that the campaign would not go forward and efforts to raise money would be abandoned if the corporation did not have the general management and control of said school; that complainant was told that he should write a letter and send it out to the various trustees and officers of the corporation and also the alumni, for the purpose of reassuring them that he was willing to co-operate, and for the further purpose of correcting any erroneous impression caused by his speech. To this, it is averred, complainant agreed.

It is further averred in the amended answer that at this meeting plans to raise $500,000 were laid, and Mr. Rand and complainant discussed the advisability of complainant's being placed on a salary as principal of said school; that as a result of the conference in St. Louis with Mr. Rand a meeting of the trustees of the corporation was held in Nashville and the by-laws of the corporation amended so as to provide for additional members, and they were elected; that on December 2, 1949, Mr. Frank Rand died, and the next meeting of the trustees was held in Nashville on February 7, 1950.

It is averred that after the death of Mr. Rand the complainant and Mr. Henry Rand, son of Mr. Frank C. Rand, carried on correspondence in an effort to carry out the agreement made with Mr. Frank Rand in September, 1949.

The amended answer reiterates many of the averments of the original answer in detailing what transpired at

the various meetings of the trustees after Mr. Frank Rand's death. It is averred that in order to obtain substantial gifts it was necessary for the corporation to obtain an exemption certificate from the Internal Revenue Department, which was done.

It is averred that dissension arose between complainant and the defendant, Mr. G. W. Follin, and the business manager, Mr. Hill Turner, and after the letting of building contracts their differences increased.

It is averred that:

"Complainant expressly agreed from time to time that the corporate defendant would have control of Webb School and complainant understood that he was employed as principal with such authority as was delegated to him by the Board of Trustees. The complainant acquiesced in the control of Webb School by the defendant corporation and its Board of Trustees, and complainant repeatedly agreed to assist in determining the amount of the indebtedness of the School so that the corporate defendant could take over the debt and complainant repeatedly agreed to execute quit claim deeds, and in all of his actions and conduct complainant indicated his complete understanding that the Board of Trustees and the corporate defendant owned and controlled Webb School.

"None of the defendants had any idea of replacing Mr. Webb as principal of Webb School until Mr. Webb wrote a letter dated June 7, 1952, wherein he repudiated the control of Webb School of the defendants. At the next meeting of the Board of Trustees, the defendant, Mr. Webb Follin, was elected principal of Webb School and the complainant was

elected principal-emeritus. He has accepted from the defendant corporation $500.00 a month, and apparently was cooperating in every respect with the principal of the school until this lawsuit was instituted.

"Your respondents charge that the complainant is estopped from denying the right of the defendants to control and operate Webb School. The complainant, by reason of his acquiescence over a period of several years, had led the defendants to believe that the corporate defendant owned and controlled Webb School and complainant has made the various agreements heretofore outlined and acquiesced in the plans and understanding of the defendants until such time as a large and substantial sum of money was raised and spent. Your respondents further deny that such an agreement as was had between your respondents and Mr. Webb was illegal because the Charter of Incorporation does not prohibit the Board of Trustees from replacing complainant under any and all circumstances. On the other hand, if the Charter prohibits the discharge of Mr. Webb during his lifetime, then your respondents assert that it is competent for the corporation or other parties to the Charter Contract to consent to its alteration or repeal, or to otherwise waive objections thereto. Complainant has waived any rights he might have by reason of the Charter."

The corporate defendant and the majority trustees then specifically plead that the complainant is estopped by reason of his own agreements with the corporation and by reason of his acquiescence.

██ Several hundred pages of testimony has been

taken and read to the Court. Much correspondence and many other documents have been filed and exhibited to the pleadings and depositions of the witnesses. Out of this great mass of testimony there can be found but little competent proof. From the competent proof alone the Court will undertake to find the controlling facts and determine and declare the status of the complainant. In view of a peculiar charter provision of the corporation below quoted, I am of the opinion that the burden is on the defendant corporation and its trustees to establish by a preponderance of the evidence that Mr. W. R. Webb, Jr., agreed for the corporation to assume complete control of the school, with the right to discharge him as principal of said school, or that by his acts and conduct he is now estopped to rely upon the charter provision above referred to and hereinbelow quoted. It is necessary at this point to give a brief history of the inception of this corporation. In October, 1920, about thirty former students of Webb School organized an association called ''The Association of Alumni and Former Students of Webb School.'' This association adopted a constitution signed by the original thirty organizers. Among the signers are some of the parties to this litigation, to-wit: Frank M. Gilliland, now a trustee and chairman of the executive committee, Mr. G. W. Follin, Mr. R. Thompson Webb and Mr. William R. Webb, Jr., the complainant. It is recited in the constitution that:

''This Association is formed to assist in preserving the traditions of the school, to extend the influence of the school by directing promising and acceptable boys to it, to maintain a closer touch between the management and former students as a body and to provide means by which those who are so disposed

may make gifts of money or property to the end that the good work of the school may be indefinitely and permanently assured.

"The governing body of the Association shall be a Board of Trustees which shall select its own officers and, in order to hold property and transact business more conveniently, shall become incorporated under the Laws of the State of Tennessee, as 'The Board of Trustees of Webb School' or other similar title.

"The Board of Trustees thus incorporated may, with the consent of the principals of the school, invite and accept gifts and subscriptions of money or property and shall hold the same subject to the direction of the principals for the use of the school, but it shall have no right or privilege to control or influence the management of the school or the selection of instructors, or to regulate the course of study, or the method of discipline, provided, however, that if by reason of death, resignation or other cause there should be no principal or principals to manage and direct the school, the Board of Trustees, in order to insure the continued conduct of the school, shall have the right to select a suitable principal or suitable principals for that purpose.

"All gifts or donations shall be accepted by the Board with the above understanding."

Five of these gentlemen who signed the constitution of the association applied to the State of Tennessee for a charter of incorporation and on June 10, 1921, a charter was granted to the Board of Trustees of Webb School:

" * * * for the promotion of education and learning and particularly for the purpose of supporting, maintaining, and perpetuating the preparatory

school at Bell Buckle, Bedford County, Tennessee, known as Webb School. The primary purpose of this Corporation is to solicit and invite subscriptions of money or property and to provide the means by which those who may be so disposed, may make gifts of money or property for the use and benefit of the aforesaid Webb School to the end that the splendid scholastic work of the said school, with its sound principles of discipline, and its inspiring moral atmosphere may be perpetuated and permanently assured; and this corporation shall have no right or privilege to control the management of said school or the selection of instructors or to regulate the course of study or the method of discipline, unless by reason of death, resignation, or other cause there should be no principal or principals to manage and direct the school and in such event this corporation, in order to assure the continued operation of such school, shall have the right to select a suitable principal or principals for that purpose.''

This charter in all other respects conforms to welfare charters granted under the statutes of Tennessee.

The defendants and perhaps a great majority of the alumni of Webb School were familiar with the above quoted provision of the Charter with reference to the control of the school, etc., prior to the beginning of the fund-raising campaign. These peculiar provisions of the charter with reference to the control and management of the school reserved to the then principals of Webb School and later to the complainant were explained in certain brochures and other advertising material that went out to the alumni of the school soliciting funds and it was especially pointed out in this campaign literature that

Mr. W. R. Webb, Jr., would *of course* continue under the charter provisions as principal of the school. After the campaign had gotten under way, it was discovered that it would be necessary to apply to the Internal Revenue Department for tax exemption certificate for Webb School in order that it might be exempt from the payment of income tax and in order that donors might deduct their contributions from their income, and Mr. Frank Gilliland of Memphis, was instrumental in obtaining this exemption certificate. Prior to this time the school had been operated by the Webbs and they paid all expenses and received all of the earnings of the school and this was true after 1926 when Mr. W. R. Webb, Jr., was the sole principal. Of course, the exemption certificate would not have been issued had Mr. Webb continued to operate the school for his sole benefit. Mr. Webb knew, as did many of the officers and trustees of the corporation, that he would have to be placed on a salary in order that the school might be entitled to this exemption certificate.

On July 1, 1950, the beginning of the school fiscal year, Mr. Webb placed himself on a salary and so notified Mr. Henry Rand, the then president of the corporation, and at the next meeting of the corporation, September 29, 1950, the minutes show that the corporation agreed to pay Mr. Webb a salary of $500.00 a month for his services as principal of said school. At this meeting, the president, Mr. Henry Rand, summarized an exchange of letters between his father, Mr. Frank Rand, and complainant, Mr. Webb, relative to the proposal by Mr. Webb that he turn over the financial operation of the school to the board of trustees and that he be placed upon a salary. The minutes recite that Mr. Frank Rand and Mr. Webb failed to bring their discussion of the matter to a definite conclu-

sion prior to Mr. Frank Rand's death, but that Mr. Webb has recently revived the discussion and requested Mr. Henry Rand to advise the board that he was desirous of being placed upon a salary and relinquished in favor of the board the financial direction and general management of the school.

At this meeting Mr. James G. Stahlman, who was at that time one of the trustees of the corporation, moved that the board assume full and complete financial direction and management of the school in accordance with the provisions of the charter of incorporation, and that the board assume all outstanding indebtedness against the school property incurred for its preservation and upkeep. Mr. Stahlman's motion was seconded and the resolution unanimously adopted.

At this same meeting, Mr. Stahlman moved that Mr. Rand, the president, be empowered to employ an auditor to make an audit of the financial status of the school, so as to ascertain the amount of the indebtedness to be assumed by the corporation. It was at this meeting that the exemption certificate was discussed and Mr. Gilliland instructed to make application for same. At this same meeting a building committee was appointed with authority to handle all matters pertaining to the construction of the new school building on the campus at Bell Buckle and the chairman was authorized to get in touch with Mr. Hill Turner and make arrangements with him to accept the position of Alumni Secretary and Executive Secretary of the National Campaign Committee (the fund-raising committee.) From these minutes it is clear that Mr. Webb voluntarily released the control and management of the financial affairs of the school to the corporation.

The letter that Mr. Webb wrote to Mr. Henry Rand on August 28, 1950, in which he states:

"I realize that it would be necessary for me to go on a salary instead of receiving the total earnings and hence the only point was to set the size of that salary.

" * * * since the present fiscal year started July 1st, I decided that I would set the salary at $6,000.00 and I began drawing $500.00 a month at that time. I do not believe the trustees will regard that as too much but if they do I would like to have any suggestions that they will make."

The salary was again mentioned by Mr. Webb in his letter to Mr. Rand dated September 18, 1950. In this letter it appears that Mr. Webb enclosed to Mr. Rand a copy of the charter of the corporation, which he refers to as articles of incorporation. Therefore, when Mr. Henry Rand brought to the attention of the board on September 29, 1950, the fact that Mr. Webb has asked to be placed on salary he is bound to have known of the peculiar provision of the charter reserving in favor of Mr. Webb the right to be principal and the right to control the school, etc., and this, no doubt, resulted in turning over to the corporation the financial direction and general management of the school and not the scholastic control and management. Mr. Webb made the statement to several parties after this meeting of September 29, 1950, that he was happy that the financial direction and general management of the school had been lifted from his shoulders and that he had been left to oversee the scholastic functions only.

There was a meeting of the executive committee held in Nashville at the Cumberland Club on May 10, 1951, at

which meeting Mr. Henry Rand, Mr. Dockery, Mr. Ragland, Mr. Gilliland, Mr. Stahlman, Mr. Laird Smith and Mr. Alden H. Smith were present. There was also present by invitation Mr. Hill Turner, Mr. Cleary Webb, Mr. W. R. Webb, Principal, and Mr. Webb Follin; Assistant Principal of Webb School. At this meeting the appointment of a finance committee was fully discussed and a resolution adopted which authorized the said committee to act in behalf of the board and to do and perform all duties and discharge all responsibilities of a financial nature necessary or incident to the operation of Webb School including the supervision and control of all monies and other assets of the corporation. The minutes of this meeting also show that it was the consensus of the meeting that a business manager should be appointed to take charge of the business operations so as to relieve Mr. Webb, Principal, and Mr. Webb Follin, Assistant Principal, from such burdensome duties and enable them to devote their full time to the school's ''educational and tutorial functions,'' and to this end a resolution was adopted appointing Mr. Hill Turner business manager with authority to handle the business and financial operations of the school, subject to the direction and control of the finance committee, and Mr. Turner was to serve in such capacity until some suitable person might be found to assume his duties.

At this meeting it was provided for the opening of a bank account in the Peoples National Bank of Shelbyville and said bank to be designated as a depositary for the operating funds of the corporation. This bank account was to be in the name of ''Board of Trustees of Webb School, Operation Account,'' and this account was subject to be checked on by the Board of Trustees of Webb

School, by Hill Turner, Business Manager, and counter-signed by Mr. Webb, Mr. Follin or Mr. Bryant Woosley. It was further provided that the checks might also be signed by Mr. Thomas A. Cooper, Treasurer, and counter-signed by Mr. Rand, as president, or Mr. Stahlman, as vice-president, or Mr. Gilliland, as chairman of the board.

On August 10, 1951, another meeting of the executive committee was held at the Cumberland Club in Nashville, when Mr. Webb and Mr. Follin, Principal and Assistant Principal of the school were present by invitation, also Mr. Hill Turner. The minutes of this meeting recite that the corporation would assume the proper indebtedness of the school and the proper officers of the corporation were authorized and empowered to pledge or encumber the corporate assets, real or personal necessary to se-cure payment of the school debts incurred by Mr. Webb.

Mr. Gilliland brought to the attention of this meeting on August 10, 1951, that the duties of the administrative officers of the school should be delineated. He reported that Mr. Webb, as a result of negotiations with Mr. Frank C. Rand, President of the corporation, at a meet-ing of the Board of Trustees held on September 29, 1950, had agreed with the board, as duly set forth in the minutes of said meeting:

" * * * to relinquish the financial direction and general management of the school in favor of the board, in consideration of their undertaking to raise funds for the construction of new buildings, and thereby contribute toward the common objective of all the alumni, to perpetuate the school, and in fur-ther consideration of their agreement to pay him a salary of $500.00 a month, commencing as of July 1, 1950, thereupon * * * it was resolved that the ad-ministrative officers of the school, Mr. W. R. Webb,

Mr. Webb Follin, Principal and Assistant Principal, respectively, and Mr. Hill Turner, Business Manager, Alumni Secretary and Executive Secretary of the National Campaign Committee, were directed to draw up without delay a chart of respective duties to the end that the responsibilities of each might be clearly defined, and submit same to the Board of Trustees, which shall have full power and authority to designate same."

Mr. Andrew Ewing, a member of the finance committee, was instructed to confer with Mr. Webb and determine and report to the finance committee what outstanding financial obligations incurred by Mr. Webb were properly chargeable to him personally and what were properly chargeable to the corporation. Mr. Webb stated to the meeting that he would co-operate fully with Mr. Ewing in determining what adjustments in connection with outstanding financial obligations were necessary. It was resolved then and there by the corporation that the corporation would assume all outstanding obligations incurred by Mr. Webb prior to July 1, 1951, as agreed upon to be just and fair between Mr. Webb and the finance committee, upon the execution and delivery by Mr. Webb of proper deeds or other instruments waiving in favor of the corporation all claims and interests he might have in the school property, both real and personal, and upon his releasing and discharging the corporation from all claims for monies advanced in the interest of the school prior to July 1, 1950.

Thereafter, on March 3, 1952, a meeting of the Board of Trustees of the corporation was held at the Cumberland Club in Nashville, beginning at 10:00 a. m. The minutes of the executive committee meeting held on May 10,

1951, were read and approved, and likewise the minutes of the executive committee held on August 10, 1951 were read and after amendment approved. It will be borne in mind that Mr. Webb was present at both of the above mentioned meetings of the executive committee. At this meeting Mr. Stahlman moved that Messrs. Rand, Ewing, Barker, Simpson and Cooper be appointed as a special committee to draft definitions of the duties of the principal, assistant principal and business manager, and to report back to the meeting before adjournment. This motion carried and the committee appointed. It is apparent from this record that before this date considerable dissension had arisen between the principal, on the one hand, and the assistant principal and business manager, on the other hand. It is apparent that Mr. Webb was of the opinion that the assistant principal and the business manager were undertaking to usurp the powers and authority of his position. Mr. Henry Rand, one of the special committee suggested by Mr. Stahlman, made the report of the committee, as follows:

"In brief, Mr. Webb as Principal, will have charge of hiring and dismissing faculty members. So far as hiring is concerned, the financial arrangements will be subject to Board approval. He will have charge of all scholastic matters including discipline. It is assumed that he will delegate such of these duties as he sees fit."

It appears from these minutes that the committee conferred with Mr. Webb before making this report and that Mr. Webb agreed to deliver to the board deeds conveying the Sawney Webb Dormitory and office building, subject only to reversionary clauses in the event the board should fail to pay the salary granted Mr. Webb and accepted by

him. On motion of Mr. Rand, the board went further in the matter of remunerating Mr. Webb for his services in that it agreed to pay Mrs. Webb $500.00 per month for her life in the event she survived Mr. Webb, and further in the event of extraordinary medical or hospitalization expenses, it agreed to review such expense accounts and take whatever action it deemed appropriate.

An advisory committee was provided for at this meeting and Mr. Smith, Mr. Ewing, and Gov. Prentice Cooper were appointed as an advisory committee of the board to the administrative officers of the school in its operation, and that in the event of misunderstanding between any of these officers the committee was authorized and empowered to settle the difference, if possible, but if the committee felt incompetent to deal with it alone the matter was referable to the executive committee or to the full board.

There were no further meetings of the Board of Trustees of the corporation or of the executive committee until June 16, 1952. It will be borne in mind that Mr. Webb was thoroughly familiar with all that had taken place at the last meeting and with all that had taken place at the last two meetings of the executive committee held on May 10th and August 10th, 1951.

Prior to the meeting of June 16, 1952, and on June 7th Mr. Webb addressed a letter to Mr. Henry Rand, President of the board, at St. Louis; a copy of this letter was likewise mailed to every member of the board of trustees, to Mr. Follin, Mr. Turner, and members of the faculty. It is apparent from this letter that Mr. Webb was terribly disturbed. He points out in this letter that the full board of trustees met March 3rd and took action on every single point at issue. He states that he was disappointed

at some of the decisions but that he was ready to accept them all and the other side should do the same thing. This letter of Mr. Webb's clearly shows that he had acquiesced in the action of the board in taking over the financial management and the business affairs of the school and in taking complete control of all of the school's assets. He points out that he has full power and authority to dismiss Mr. Follin, which authority he shall not relinquish. He also points out that he is legally and morally the principal of Webb School and there is no one who can force him out. He is evidently referring to the provisions of the corporate charter.

The meeting of the executive committee held on June 16, 1952, had been arranged and called prior to Mr. Webb's writing this letter. At this meeting, by invitation, Mr. Follin, and Mr. Turner, were both present but Mr. Webb was not present. There were present certain other members of the Board of Trustees who were not members of the executive committee. The letter of Mr. Webb was discussed at this executive committee meeting and incorporated in full in the minutes. Following the reading of Mr. Webb's letter Mr. Gilliland gave an outline of the original organization of the Board of Trustees of Webb School and the various conferences with Mr. Webb and his father relating to the operation of the school and the respective functions of the Board of Trustees and the Messrs. Webb, and then sketched in some detail the negotiations initiated by Mr. Webb in the year 1949 with Mr. Frank C. Rand and culminating in the action of the Board of Trustees, by agreement with Mr. Webb in the year 1950, under which agreement the Board of Trustees assumed the financial direction and general management of the school and agreed to pay Mr. W. R.

Webb a salary in the amount of $500 per month. At this meeting Mr. Turner, the business manager, and Mr. Follin, the assistant principal, were called upon to make, and did make, answers to various questions propounded to them relative to the unfortunate situation that existed between them and the principal, after which Mr. Follin and Mr. Turner withdrew from the meeting. The executive committee then took up and fully discussed Mr. Webb's letter and considered what action should be taken in connection with it, and it was decided that the school could not be successfully operated under the conditions set forth in Mr. Webb's letter. It appears that the executive committee felt that it was under an obligation to the alumni who had generously contributed to the funds, to discharge Mr. Webb as principal. A resolution was thereupon adopted to the effect that the executive committee would recommend to the full Board of Trustees—the corporation—that Mr. Webb be retired as principal and thereafter have the title of Principal Emeritus, at a salary of $500 per month during the remainder of his life, and $500 to Mrs. Webb if she survived him, for the remainder of her life, upon condition that Mr. Webb accept his status as Principal Emeritus and cooperate with the school management, and further, upon condition that Mr. Webb and wife convey to the Board of Trustees his life estate in the Sawney Webb dormitory and office building, and further conditioned upon Mr. Webb accepting a five year interest bearing note for all and any part of the Shelbyville Bank notes properly chargeable to the school.

On July 12, 1952, the Board of Trustees held a meeting at the Cumberland Club in Nashville. It appears that there were twenty-one members of the board present at

'this meeting. The minutes of the executive committee meeting recommending the discharge of Mr. Webb as principal were read. These minutes included the letter of Mr. Webb, which was not read. The minutes of the executive committee were approved. The chairman asked if there was a motion to adopt the recommendation of the executive committee and the motion to adopt was made by Mr. Williams and seconded by Mr. Ewing. Then followed a complete discussion of the motion by those present. Mr. Ragland, who had made the motion which resulted in the executive committee's recommendation, then moved to the executive committee that the recommendation be withdrawn. By an executive committee vote of four against and three in favor, Mr. Ragland's motion to withdraw was defeated. With the recommendation again before the board, Gov. Prentice Cooper moved that the motion to adopt the executive committee's recommendation be tabled. His motion was seconded by Mr. Simpson and the motion to table was carried by a vote of eleven in favor and nine against.

The minutes show that the board then recessed at 2:30 p.m. and because the Cumberland Club was to close at that time it was arranged for the meeting to be held in the board room of the Third National Bank in Nashville, and the board reconvened at the bank building at 3:35 p.m. After some discussion, Mr. Norfleet presented a resolution requesting Mr. W. R. Webb's retirement as principal with an allowance of $500 for life and a continued allowance to his wife if she survived; that Mr. Follin be employed as principal for a period of one year. Mr. Norfleet's motion was duly seconded and after a vote was taken it was found to have carried by nine to eight. Gov. Prentice Cooper asked to be placed on record as saying

that he voted against the resolution because he believed the board lacked authority to take such action. Messrs. Bell, Foster and Norfleet were not present at the last meeting. The action of this board on July 12, 1952, precipitated this unfortunate lawsuit.

The question to be decided is: Did the corporation have authority to discharge Mr. Webb as principal? From all of the facts and circumstances in this record the Court is of the opinion that the corporation had no such power or authority.

It is insisted on behalf of the corporation that Mr. Webb agreed with Mr. Frank Rand in St. Louis in 1949 that the complete management and control of the school should be lodged in the hands of the corporation. The corporation insists that Mr. Rand was disturbed about the statement of Mr. Webb in his speech to the alumni meeting on April 30, 1949, to the effect that be would be the sole judge when he should retire, etc., and that Mr. Rand made it clear to Mr. Webb that the campaign for funds would not go forward unless he wrote a letter clearing up this situation.

It is further insisted, and it is proven in this record, that Mr. Rand himself actually wrote the letter that Mr. Webb signed and sent out under date of October 8, 1949. Mr. Webb says that he changed only two words in this letter. The letter had been carefully read and the Court can find nothing in this letter with reference to any agreement on the part of Mr. Webb to turn over to the corporation the complete management and control of Webb School. In fact, no witness in this record testified that Mr. Webb ever specifically agreed to relinquish his authority over the scholastic life of the school.

Mr. Gilliland attended the St. Louis meeting in Mr.

Frank Rand's office in 1949. On February 1, 1950, he addressed a letter to the defendant, Frank P. Barker, in which he stated, among other things:

"The understanding, however, between the Trustees and the Webbs was that the Trustees would have nothing to do with the management of the school as long as Old Sawney or Son Will lived."

Mr. Henry Rand, who became president after his father's death, addressed a letter to Mr. Barker on June 8, 1951, in which he said:

"Mr. Webb will, of course, continue to direct the education side."

Here we have two men who say, in effect, that it was understood at the St. Louis conference that the *entire* control of the school was to pass to the corporation, but after the St. Louis conference the letters above referred to and quoted from are written. These gentlemen are surely mistaken. When they wrote the letters to Mr. Barker the details of the St. Louis agreement were fresh in their minds. When they testified they evidently lost sight of the fact that it was the control and management of the financial and business functions rather than the scholastic functions that Mr. Webb intended to divest himself of.

It appears to the Court that Mr. Webb has at all times relied upon the charter provision in respect to this function of the school. There can be no doubt that Mr. Webb agreed, first with the executive committee, and then with the full board, to turn over the financial control and management of the school, together with all of its assets, to the corporation.

It appears from this record that this was absolutely necessary since the plan of operation of the school had

been materially changed and it had been granted an exemption certificate by the Internal Revenue Department. Mr. Webb cannot now be heard to complain about that which he has already agreed to. It may be true that some of the members of the board of trustees interpreted Mr. Webb's agreement to surrender the financial control and management of the assets and properties of the school to include the surrender of the scholastic functions but it is clear to my mind that Mr. Webb had no such intention. This being true, there was no meeting of the minds on this proposition.

It is insisted on behalf of the corporation that under its general powers and under the law it has the right to discharge Mr. Webb for cause, and it being made to appear to the Board of Trustees that Mr. Webb did not work in harmony with the corporation and with the members of the faculty that the board even under the charter powers had the right to remove Mr. Webb.

It is pointed out that in the event there should be no principal because of death, resignation, *or other cause,* the corporation would have the power to select a principal, etc. It is insisted that the ''other cause'' provision gives to this corporation the power to remove Mr. Webb.

██ ██ The Court is of the opinion that this corporate charter should be construed in this regard in the manner and according to the rules governing legislative enactments, and that the rule of Ejusdem Generis is applicable to this charter. This is a rule of interpretation, and in substance is that where in a statute general words follow special words, which limit the scope of the statute, these general words must be construed as applying to things of the same kind or class as those indicated by the preceding special words. It will be noted that the corpora-

tion was denied the power to appoint a principal unless by reason of death, resignation or other cause there should be no principal. "Death," and "resignation," are specific terms. The general words "other cause," not being specific must, therefore, be construed as applying to things of the same kind or class as those indicated by the preceding special words. The only other cause that occurs to the Court which would authorize the corporation to appoint a principal would be the incapacity of the principal to act as such, and I think this is clearly the meaning of the language of the charter. For discussion of the doctrine of the rule of Ejusdem Generis as applied to statutory construction, see State v. Wheeler, 127 Tenn. 58, 152 S. W. 1037; State ex rel. Davidson County Board of Education v. Pollard, 124 Tenn. 127, 136 S. W. 427.

Therefore, the Court cannot agree that the words "other cause" give authority to the corporation to appoint another principal in the stead of Mr. Webb unless it should be first found by the corporation, acting in good faith, that Mr. Webb is incapable by reason of physical or mental disability to perform the duties of principal of said school.

It is clear from this record that it had never occurred to any of the trustees to ever remove Mr. Webb as principal of the school insofar as the scholastic functions are concerned, so long as he might live, and it is admitted in the answer of the corporation and the majority of the trustees that it would not have discharged him and appointed another in his place had it not been for the letter that he wrote on June 7, 1952. Therefore, when it was agreed by Mr. Webb that he would surrender the financial management and control of the school to the corpora-

tion, the corporation did not interpret this agreement to mean that he would surrender the scholastic functions to the corporation. It seems that the executive committee in recommending to the full board of trustees the retirement of Mr. Webb, felt that it would be derelict in its duty to the alumni who had generously contributed funds for the benefit of the school unless it recommended the discharge of Mr. Webb, etc. This record is replete with evidence that from the beginning and throughout the campaign the alumni were given notice in the advertising and campaign literature that Mr. Webb would be retained as principal. Therefore, it would not be a breach of trust on the part of the executive committee or the corporation or its board of trustees to retain Mr. Webb, even though dissension had risen between him and Mr. Follin and the business manager. The donors of these funds knew from the beginning that Mr. Webb was to be retained and, of course, dissension among the parties was not at that time contemplated.

This charter provision is a contract between the State of Tennessee and the corporation. Such provisions have been consistently held to be contracts since the decision of the Supreme Court of the United States rendered in the Dartmouth College case. In this charter the State of Tennessee withheld from the corporation the power to remove Mr. Webb. This provision was for the benefit of Mr. Webb and likewise for the benefit of the school, and so long as he lives or until he resigns or becomes incapacitated to perform the duties of principal this contract provision will have to be respected by the corporation.

It is argued on behalf of the corporation that it is under this record manifestly to the interest of the

school that Mr. Webb be replaced. This may be true, but this Court cannot determine by decree in this case that which may appear to be to the manifest interest of the school. The Court is called upon to determine the status of Mr. Webb and to declare his relationship to the school under the terms of the charter, and having found that he has not surrendered voluntarily his right to act as principal, the Court cannot deprive him of that position simply because it may be to the best interest of the school to do so. If the Board of Trustees were authorized under the charter provisions to remove Mr. Webb as principal, this Court certainly would not substitute its judgment for the judgment of the Board of Trustees, but the Court simply holds that the Board of Trustees went beyond its authority in discharging Mr. Webb without his resignation or ''other cause.'' Certainly he has not resigned; certainly he is still living, and certainly no other cause for his discharge has been shown.

The Court is, therefore, compelled to declare Mr. Webb's status to be that of principal of Webb School, with power and authority given him by the charter to select the instructors, to regulate the course of study and the method of discipline. Mr. Webb having voluntarily surrendered to the corporation the control and management of the financial and business affairs, property and assets of the school, he can no longer assume the control of such functions.

The Court cannot agree with counsel that Mr. Webb by his conduct and actions has waived his right to rely upon the charter provisions hereinabove referred to, or by his acts and conduct estopped himself to rely upon said provisions. It is said in 56 American Jurisprudence under the title of ''Waiver,'' at page 104, that:

"A waiver is an intentional relinquishment, while the indispensable elements of an estoppel are ignorance of the party who invokes the estoppel, a representation by the party estopped which misleads, and an innocent and deleterious change of position in reliance on that representation, where a party relinquishes a known right awarded him by contract, he cannot, without the consent of his adversary, reclaim it."

Our own Tennessee cases are in accord. They uniformly hold that there must be absolute action or inaction inconsistent with the claim or right in order to constitute waiver by conduct.

It is further held that waiver of a legal right must be evidenced by a clear, unequivocal and decisive act of the party showing such a purpose, or acts amounting to an estoppel on his part, and that it cannot be made out by acts of uncertain implication, but ought to clearly appear in order to constitute a waiver of the contract benefit. Our courts have sometimes said there must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended. Ross v. Swan, 75 Tenn. 463; Koontz v. Fleming, 17 Tenn. App. 1, 65 S. W. (2d) 821; Charleston, S. C., Mining & Mfg. Co. v. American Agricultural Chemical Co., 126 Tenn. 18, 150 S. W. 1143.

In Moss v. Aetna Life Ins. Co., 6 Cir., 73 F. (2d) 339, 341, it is said that the waiver must be intended by one party and so understood by the other.

In Baird v. Fidelity-Phoenix Fire Ins. Co., 178 Tenn. 653, 162 S. W. (2d) 384, 140 A. L. R. 1226, it is said that a waiver is an intentional relinquishment of a known right, whereas an estoppel can be maintained only on

the ground that by the fault of one party, another has been induced to change his position for the worse in such a manner that it would operate as a virtual fraud on him to allow the party by whom he had been misled to assert the right in controversy.

It appears to the Court that when Mr. Webb agreed to accept the $500 salary and surrender the financial control and management of the school and placed all property and other assets in the hands of the corporation he likewise agreed to execute such instruments as would be necessary to vest the school with a good title to all of said property, with perhaps a possibility of reverter clause in his favor with respect to certain parcels of real estate in which he now owns a life estate, and Mr. Webb should carry out this agreement and his status as principal is declared with the understanding that this agreement with reference to the property will be carried out. Likewise the corporation should unconditionally assume the indebtedness at the bank incurred by Mr. Webb. This was part of the agreement which induced Mr. Webb to surrender the financial control and management of the property to the corporation, and the status of the corporation and its relation to the property is so declared, on condition that it will assume said financial obligations.

It was agreed in open court by counsel representing the complainant and defendants that it would not be necessary to order a reference to determine the amount of indebtedness properly chargeable to the school, the payment of which should be assumed by the corporation and Mr. Webb relieved thereof. It was stated by counsel that they would have no trouble in arriving at this amount.

When Mr. Webb has executed the necessary papers vesting the corporation with good title to all of said school property, his status as principal is restored to him. In depriving Mr. Webb of all control of the financial and business affairs of the corporation and declaring that the corporation, by reason of Mr. Webb's agreement, may exercise such functions, it is with the understanding that the corporation will assume the indebtedness aforesaid and relieve Mr. Webb of any and all further liability on account thereof.

Let a decree be accordingly drawn and entered. Either or both parties may appeal from said decree and thirty days will be allowed in the decree to perfect any appeal that may be desired.

From a decree in accordance with this opinion the defendants have appealed and have assigned errors. The evidence does not preponderate against the facts as found by the Chancellor.

We fully concur with the Chancellor in the finding of facts and are in accord with the conclusions expressed. We therefore adopt the opinion of the Chancellor as the opinion of this Court.

The assignments of error are overruled and the decree of the Chancery Court of Bedford County is affirmed.

The appellants will pay the costs.

Felts, P. J., and Hickerson, J., concur.

Affirmed.

### ON PETITION TO REHEAR.

HOWELL, J. In this case we are presented with a petition to rehear in which it is insisted that the restric-

tive provisions of the Charter are in conflict with the general laws of Tennessee.

The case was fully presented upon the hearing by a lengthy brief with many assignments of error and propositions of law and fact set out. We carefully examined the entire record and briefs and considered the arguments of counsel and concluded that the Chancellor had reached the merits of the controversy. We therefore adopted the opinion of the Chancellor and affirmed the decree of the Chancery Court.

It is noted that in the opinion of the Chancellor it appears that in October, 1920 some former students of Webb's School organized an association to be known as "The Association of Alumni and former students of Webb School" and adopted a constitution in which appears the following language:

"The Board of Trustees thus incorporated may, with the consent of the principals of the school, invite and accept gifts and subscriptions of money or property and shall hold the same subject to the direction of the principals for the use of the school, but it shall have no right or privilege to control or influence the management of the school or the selection of instructors, or to regulate the course of study, or the method of discipline, provided, however, that if by reason of death, resignation or other cause there should be no principal or principals to manage and direct the school, the Board of Trustees, in order to insure the continued conduct of the school, shall have the right to select a suitable principal or suitable principals for that purpose."

Later and on June 10, 1921, a Charter of Incorporation was granted by the State of Tennessee to the Board

of Trustees of Webb School and the sole purpose of the Charter is set out therein as follows:

"* * * for the promotion of education and learning and particularly for the purpose of supporting, maintaining, and perpetuating the preparatory school at Bell Buckle, Bedford County, Tennessee, known as Webb School. The primary purpose of this corporation is to solicit and invite subscriptions of money or property and to provide the means by which those who may be so disposed, may make gifts of money or property for the use and benefit of the aforesaid Webb School to the end that the splendid scholastic work of the said school, with its sound principles of discipline, and its inspiring moral atmosphere may be perpetuated and permanently assured; and this corporation shall have no right or privilege to control the management of said school or the selection of instructors or to regulate the course study or the method of discipline, unless by reason of death, resignation, or other cause there should be no principal or principals to manage and direct the school, and in such event this corporation, in order to assure the continued operation of such school, shall have the right to select a suitable principal or principals for that purpose."

The school has operated under this charter since that time. Everybody connected with the school was familiar with the Charter and those provisions were explained to everyone who was solicited for contributions to the school and they knew that it was provided that W. R. Webb, Jr. would continue as principal of the school under its charter and the defendants were granted a certificate of exemption by the Internal Revenue Department of the

United States Government and received contributions by reason thereof.

The Charter clearly sets out that the defendants were not to have authority over the scholastic and disciplinary activities of the school unless by reason of death, resignation or other cause there should be no principal to manage or direct the school.

The school has been conducted under the terms of the constitution above mentioned and articles of incorporation since 1921, and the defendants cannot now be heard to complain.

The equities of the case are with the complainant.

The petition to rehear is denied at the costs of petitioner.

Felts, P. J., and Hickerson, J., concur.