89 F.3d 835
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
REPUBLIC-FRANKLIN INSURANCE CO., Plaintiff-Appellant,
v.
Peter T. BOSSE, Administrator of the Estate of Jason Bosse,
Defendant-DNNo. 95-3401.
 United States Court of Appeals, Sixth Circuit.
 June 4, 1996.
 
 Before: GUY, NELSON, and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is a diversity action involving an insurer's denial of a claim for underinsured motorist benefits. The plaintiff-insurer sought a declaratory judgment affirming its denial based upon the insured not taking the necessary steps to preserve the insurer's subrogation rights. The insured claimed that the insurer was estopped from denying the claim.
 
 
 2
 The district court held that, based on the insurer's knowledge of a potential claim for underinsured motorist benefits, the insurer had a duty to act to preserve its subrogation rights, and the insurer should have advised the insured of the need to sue or otherwise make claims against the tortfeasor. The court therefore found for the insured. We conclude that the district court erred and we reverse.
 
 I.
 
 3
 On November 9, 1990, Jason Bosse was a passenger in a vehicle that was operated by Daniel Floyd. Bosse was a resident of Maine. The two young men, who were members of the United States Armed Forces, were traveling on an interstate highway in Illinois when a vehicle operated by John O. Sowers crossed the median and hit the Floyd vehicle head on. Floyd was seriously injured and Bosse and Sowers were killed.[1]
 
 
 4
 At the time of the collision, Floyd was insured under a personal automotive insurance policy issued to his father by Republic-Franklin Insurance Company (RFI). RFI is a division of Utica National Insurance Group and its principal place of business is in Columbus, Ohio. Sowers was insured by State Farm Mutual Automobile Insurance Company and had bodily injury liability limits of $100,000 per person. Bosse was insured under two policies, as a family member under his father's automotive insurance policy issued by Maine Bonding Company and as a passenger in the Floyd vehicle under the RFI policy.
 
 
 5
 Both the Maine Bonding Company and the RFI policies had identical language regarding underinsured motorist coverage. Part C of the policies provides for underinsured motorist coverage. These policies provide in pertinent part as follows:
 
 
 6
 A. We will pay compensatory damages which an "insured" is legally entitled to recover from the owner or operator of an "uninsured motor vehicle" because of "bodily injury:"
 
 
 7
 ....
 
 B. "Insured" as used in this Part means:
 
 8
 1. You or any "family member."
 
 
 9
 2. Any other person "occupying" "your covered auto." ...
 
 
 10
 (App. at 59 and 80.) The term "uninsured motor vehicle" is broadly defined to include underinsured motor vehicles, as well. Id.
 
 
 11
 Both also contained identical language protecting the insurer's subrogation rights. Part F, the general provisions section of the policies, contains the following language:
 
 OUR RIGHT TO RECOVER PAYMENT
 
 12
 A. If we make a payment under this policy and the person to or for whom payment was made has a right to recover damages from another we shall be subrogated to that right. That person shall do:
 
 
 13
 1. Whatever is necessary to enable us to exercise our rights; and
 
 
 14
 2. Nothing after loss to prejudice them.
 
 
 15
 ....
 
 
 16
 B. If we make a payment under this policy and the person to or for whom payment is made recovers damages from another, that person shall:
 
 
 17
 1. Hold in trust for us the proceeds of the recovery; and
 
 
 18
 2. Reimburse us to the extent of our payment.
 
 
 19
 (App. at 64 and 85.)
 
 
 20
 Bosse's estate is administered by his father, Peter T. Bosse. Peter Bosse first learned of the RFI policy within days of the accident during a conversation he had with Floyd's family members. During that same time period, RFI was notified by its insurance agent of the accident. In response to notification, RFI established an accounting reserve in the amount of $50,000 in anticipation of an underinsured motorist claim by the Bosse estate. In addition, shortly thereafter, on November 19, 1990, Gary Conklin, an adjuster who had been hired by RFI to investigate the case, contacted the Bosses. Notes taken by Conklin at the time indicate that he informed the Bosses that Jason Bosse's emergency room expenses and funeral expenses were covered by the medical payments coverage of the RFI policy. There is no indication in the record, however, that the Bosses were ever informed by Conklin or any other representative of RFI about underinsured motorist coverage.[2]
 
 
 21
 Approximately two weeks after the accident, Peter Bosse consulted with the law firm of Gross, Minsky, Mogul & Singal, P.A. in connection with his son's death. In that meeting he told them that Floyd was insured by RFI. Despite these events, neither the Bosses nor their legal counsel ever contacted RFI to request a copy of the Floyd policy.
 
 
 22
 On January 11, 1991, a petition for probate of Sowers' will was filed in Illinois state court. The petition stated that the approximate value of the Sowers estate was $150,000 in personal property and $15,000 in real property.
 
 
 23
 Within weeks of the filing of the petition, on February 26, 1991, the attorney for the Sowers estate wrote to the Bosse estate through its attorney indicating that the probate proceeding had been commenced. The letter of notification included the claim notice that had been published, which expressly stated that claims against the estate "may be filed ... within 6 months from the date of issuance of letters and any claim not filed within that period is barred." (App. at 104.) Despite this notice, the Bosse estate let the six months run without filing a claim.
 
 
 24
 On October 22, 1991, after the claim filing deadline had expired and almost a year after the accident occurred, the Bosse estate first contacted RFI. It indicated that it was seeking underinsured motorist benefits under Floyd's policy. Within a week, on October 28, 1991, it again contacted RFI indicating that it had negotiated a proposed settlement for $100,000 under Sowers' insurance policy with State Farm and asked RFI to consent to the release of its subrogation rights against the Sowers estate and State Farm.
 
 
 25
 In preparing a response to this request, RFI attempted to determine the extent of its subrogation rights. It repeatedly inquired whether the Bosse estate had filed suit or otherwise made a claim against the Sowers estate. On November 18, 1991, the law firm for the Bosse estate informed RFI that it had not. Meanwhile, on October 29, 1991, notwithstanding its pending request to RFI for consent, the Bosse estate executed a release of all claims against the Sowers estate and State Farm, only one day after requesting such consent and only seven days after notifying RFI that it was filing a claim for benefits. Because the Bosse estate, by ignoring the limitations period controlling the filing of claims against the Sowers estate and by executing a release as to any claims it might have, made it impossible for RFI to pursue its subrogation rights, the request for benefits was denied.
 
 
 26
 RFI then filed this declaratory action seeking a determination that it did not owe the Bosse estate underinsured motorist benefits under the policy based on the estate's failure to preserve RFI's subrogation rights. Peter Bosse, as administrator for the Bosse estate, counterclaimed for a declaration that RFI was estopped from enforcing the contract's subrogation clause. In his counterclaim he indicated that he had never seen a copy of the RFI policy and that RFI "never advised [Peter Bosse] of the terms of the applicable policy or of [Peter Bosse's] alleged obligation to file a claim" against the tortfeasor's estate.
 
 
 27
 The district court entered declaratory judgment for Peter Bosse and RFI now appeals.
 
 II.
 
 28
 An insurer's right of subrogation has been long recognized. McDonald v. Republic-Franklin Ins. Co., 543 N.E.2d 456, 459 (Ohio 1989) (citing Newcomb v. Cincinnati Ins. Co., 22 Ohio St. 382 (1872)). The Ohio General Assembly specifically codified this common law right as it pertains to providers of uninsured and underinsured motorist coverage by enacting Ohio Rev.Code Ann. § 3937.18(E) (Anderson 1989). The Ohio Supreme Court has repeatedly recognized the reasonableness of subrogation clauses in contracts providing underinsured motorist insurance. See, e.g., McDonald, 543 N.E.2d at 459 (a subrogation clause is " 'both a valid and enforceable precondition to the duty to provide underinsured motorist coverage' ") (quoting Bogan v. Progressive Casualty Ins. Co., 521 N.E.2d 447, 455 (Ohio 1988)). At issue in this case, however, is to what extent must an insurer aid an insured in preservation of this right.
 
 
 29
 On appeal, RFI contends that the district court erred in its conclusion that because RFI was aware of the potential claim for underinsured motorist benefits by the Bosse estate, RFI had a duty to aid the estate in preserving RFI's subrogation rights prior to the October 22, 1991, notification by the estate of its claim for underinsured motorist benefits. In support of its decision, the district court relied on McDonald v. Republic-Franklin Ins. Co., 543 N.E.2d 456 (Ohio 1989). In that case, the Ohio Supreme Court held that upon notification to an insurer by an insured of a settlement offer from the tortfeasor, an insurer had a duty to aid an insured in preserving the insurer's subrogation rights. Id. at 460. In McDonald, the insured had received a settlement offer of $50,000, the limits of the tortfeasor's insurance policy. In exchange, the insured was requested to execute a release of her claims, including any subrogation rights available to her insurer. McDonald promptly notified her insurer of the proposed offer and sought consent. The insurer, RFI, who is also the plaintiff in this action, failed to respond. Eighteen months passed. Ultimately, the insured executed a release. When presented with the claim for underinsured motorist benefits, RFI sought to defend on the basis that by executing the release the insured had failed to preserve the insurer's subrogation rights.
 
 
 30
 The Ohio Supreme Court rejected RFI's defense and stated:
 
 
 31
 [W]here ... the underinsurer is promptly notified of the settlement offer, both the underinsurer and the insured are in a position to protect the underinsurer's subrogation rights. We hold that when an insured has given his underinsurance carrier notice of a tentative settlement, prior to release, and the insurer has had a reasonable opportunity to protect its subrogation rights by paying the underinsured motorist benefits before the release but does not do so, the release will not preclude recovery of underinsurance benefits. The insurer's failure to respond, within a reasonable time, to notification by its insured of a settlement offer will operate to void a subrogation clause in the insurer's underinsured motorist provision.
 
 
 32
 Id. (citation omitted).
 
 
 33
 In applying McDonald to the facts of this case, the district court recognized that it was imposing a duty on RFI to act to preserve its subrogation rights even before notification of a settlement offer. Nevertheless, the court relied on the syllabus language in McDonald that states that "[a]n insurer must aid its insured in the preservation of its subrogation rights," id. at 457, as well as the McDonald court's pronouncement that a subrogation clause "does not operate to place the entire burden of protection on the insured," id. at 460, to support its result.
 
 
 34
 In our view, the district court's expansive interpretation of an insurer's duty to aid an insured in preserving subrogation rights is an unwarranted extension of controlling Ohio law. When deciding a diversity case under state law, a federal court must apply the law of the state's highest court. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). The McDonald court unequivocally stated the parameters of an insurer's duty to aid in the preservation of its subrogation rights. The following language, omitted by ellipsis in the district court's opinion quoting McDonald provides as follows:
 
 
 35
 In this case, as in most cases, the tortfeasor's insurer made a settlement offer of its full policy limits. That offer was conditioned upon a general release of all claims against the tortfeasor by the injured party. Before an injured party notifies his underinsurance carrier of the offer, the injured party is the only one in a position to protect or destroy the underinsurer's subrogation rights. It has been held that "[a]n insured who settles with and releases an underinsured tortfeasor before giving her insurer notice * * * is precluded from bringing an action against her insurer for underinsured motorist benefits." Klang v. American Family Ins. Group (Minn.App.1986) 398 N.W.2d 49, syllabus....
 
 
 36
 543 N.E.2d at 460 (emphasis added). In this case the Bosse estate did not notify RFI until after it had destroyed RFI's subrogation rights by allowing the claim filing period to expire. Based on what we believe to be a correct reading of McDonald, we conclude the district court erred in finding that under the circumstances presented here, RFI had a duty to act prior to notification of the settlement offer.[3]
 
 
 37
 The district court also relied on language in McDonald that "an insured who destroys his insurer's subrogation rights without the insurer's knowledge does so at his peril." Id. The district court construed the word "knowledge" in this quote to mean knowledge of a potential claim for underinsured motorist benefits. By negative implication, therefore, the district court concluded that if an insured destroys his insurer's subrogation rights when the insurer has knowledge of a potential claim he does not do so at his peril. The district court relied on RFI's acknowledgment that it knew of the potential claim.
 
 
 38
 Here again, we read the language differently than did the district court. The language, "an insured who destroys his insurer's subrogation rights without the insurer's knowledge does so at his peril," appears in the same paragraph in which the statement appears regarding the singular position of an injured party to protect an insurer's subrogation rights prior to notifying the insurer of a settlement offer. Id. In context, therefore, we believe the reference to "knowledge" properly refers to an insurer's knowledge that his subrogation rights are to be destroyed, such as by consent to settlement and release of all claims against the tortfeasor.
 
 
 39
 In McDonald, the insured did all she could to preserve the insurer's right to subrogation. The McDonald court recognized that at that point in time, the insured could do no more. It was up to the insurer, RFI, to either consent to settlement and release of claims with knowledge that its subrogation rights would be destroyed or it could satisfy its liability to the insured and proceed under its subrogation rights to attempt to recover from the tortfeasor.
 
 
 40
 In this case the insured did not do what was necessary to preserve RFI's subrogation rights. The law firm for the Bosse estate was retained within a short time after the accident; it knew of RFI and Floyd's policy; it received timely notice of the opening of the Sowers estate, including notification of the claims limitation period; yet the Bosse estate failed to file a claim against the Sowers estate, destroying RFI's subrogation rights. In contrast, the other injured party, Floyd, timely filed a claim against the Sowers estate.
 
 
 41
 At least two intermediate appellate courts in Ohio, in unpublished opinions, have reached a conclusion opposite to that reached by the district court.[4] See Joehnk v. Cincinnati Ins. Co., 1994 WL 250111 (Ohio App.), appeal not allowed, 641 N.E.2d 204 (Ohio 1994); Bielefeld v. State Farm Mut. Ins. Co., 1994 WL 614991 (Ohio App.1994); appeal allowed, 646 N.E.2d 1126 (Ohio 1995); appeal dismissed, 657 N.E.2d 1374 (Ohio 1995).
 
 
 42
 In Joehnk, the insurer prevailed under facts even more favorable to the insured than exist here. In that case, the insured was injured while traveling as a passenger in an automobile. The driver of another vehicle and the driver of the vehicle in which Joehnk was riding were both negligent.
 
 
 43
 Shortly before the statute of limitations for filing suit against the tortfeasors was to expire, Joehnk wrote to her insurer, Cincinnati Insurance Company (CIC), indicating that she might present a claim for underinsured motorist benefits and inquired as to what action CIC wanted her to take. She further indicated that she intended to sue the driver in whose vehicle she had been injured. CIC responded that it was Joehnk's responsibility to protect its subrogation rights and that the company would not investigate the facts of the accident until an underinsured motorist claim was established, that is, until there was a final written offer from the tortfeasor's insurance carrier. Id. at * 1.
 
 
 44
 Joehnk only sued the driver of the vehicle in which she was a passenger and received a settlement for the limit of the driver's insurance. After the statute of limitations had expired, Joehnk then sought underinsured motorist benefits. CIC contended that Joehnk was not entitled to benefits because she had failed to sue the other negligent driver within the prescribed time limits thus destroying CIC's subrogation rights against that driver. The trial court agreed.
 
 
 45
 On appeal, the Ohio Court of Appeals affirmed. It reasoned that a subrogation clause is an enforceable precondition to an insurer's duty to provide underinsured motorist coverage. Citing to McDonald, the court held that "it was [the insured's] sole responsibility to protect CIC's subrogation rights until a settlement offer was made, after which CIC would have had a duty to aid [the insured] in protecting its subrogation rights." Id. at * 5.
 
 
 46
 In Bielefeld, 1994 WL at 614991, the insured was a passenger who was killed in an automobile accident. The insured's estate did not sue the tortfeasor, who was the insured's son, thus failing to protect the insurer's subrogation rights. The court of appeals, while citing McDonald and referencing an insurer's duty to assist the insured in protecting subrogation rights, upheld denial of coverage. Id. at * 4-5.
 
 III.
 
 47
 The Bosse estate also argues that RFI's failure to aid it estops RFI from asserting prejudice to its subrogation rights as a defense to the underinsured motorist claim. As it states in its brief: "Guided by the particular facts in this case, Judge Holschuh merely held that it is inequitable for an underinsured motorist insurer to 'sit back' and wait for its insured to stumble and then attempt to take advantage of the insured's mistake." The estate further argues, "[i]t would have been a very simple matter for RFI to have written a letter to Mr. Bosse (whom the company had contacted previously) alerting him to the fact that Illinois law required him to act promptly if he wished to preserve his family's rights against RFI." It concludes, "[i]n no way did RFI lose its ability to assert a claim against the Sowers estate except by its own device."
 
 
 48
 The principles of equitable estoppel are well established: "Equitable estoppel precludes a party from asserting certain facts where the party, by his conduct, has induced another to change his position in good faith reliance upon that conduct." State ex rel. Cities Serv. Oil Co. v. Orteca, 409 N.E.2d 1018, 1020 (Ohio 1980). In this case, there is no evidence that RFI's conduct induced the Bosse estate to ignore the deadline for filing claims against the Sowers estate. Indeed the only "conduct" RFI engaged in was silence. The Bosse estate could not rely on that silence in light of the February 1991 letter from the attorney for the Sowers' estate to plaintiff's counsel notifying him that the probate case had been opened and enclosing the applicable time limits on filing claims. The Bosse estate, represented at all times by counsel, knew of the RFI policy, knew of the Sowers estate, was notified of the claims limitations period, and took no action. Under these circumstances, we find no estoppel.
 
 
 49
 REVERSED and REMANDED.
 
 
 
 [1]
 Since the insurance policy at issue was issued in Ohio to an Ohio resident, Ohio law applies, notwithstanding the fact that the accident occurred in Illinois
 
 
 [2]
 There is no contention, however, that RFI had any duty to contact the Bosses at all at this point in time
 
 
 [3]
 The Bosse estate acknowledges the potential breadth of the district court's interpretation of an insurer's duty under McDonald. It suggests that the only time the duty to aid would not come into play is when the insurer is not aware of a possible underinsured motorist claim. Under this interpretation of Ohio law, the insurer's duty would begin at the moment the accident is reported
 
 
 [4]
 In citing unpublished opinions, we recognize that they are not generally considered controlling authority under Ohio law, see Ohio Sup.Ct.R. for Reporting of Opinions 2(G) (1983). We cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases. See, e.g., Royal Indemnity Co. v. Clingan, 364 F.2d 154, 158 (6th Cir.1966) ("[a]lthough we are not bound in a diversity case by an unreported decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery in determining what is the controlling [state] law") (citations omitted)