## W. C. McAdams *v.* The State.

1. CRIMINAL LAW. *Charge of court.* Upon the trial of an indictment for stealing a mule, there is no error of which defendant can complain in the following charge: "If you find from the proof that the prosecutor, with others, agreed or arranged with the principal witness for the State that he and defendant should steal his, the prosecutor's mule, then the defendant would not be guilty; but on the other hand, if you find from the proof that the defendant formed a design to steal mules, and communicated this design to the principal witness, or if the defendant and the principal witness formed the design to steal mules, and the prosecutor, with others, being informed of the fact, arranged with the principal witness to so conduct matters as that the defendant might be detected and caught, then the defendant would be guilty."

2. SAME. *Evidence.* There is no error in sustaining an objection to a question of the defendant, the expected response to which would not be relevant to the issues on trial, nor of any service to the defendant unless coupled with other evidence not offered.

3. SAME. *Same.* *New trial.* When a prisoner's guilt is clearly established by direct testimony, it is no ground for a new trial that evidence was introduced not strictly admissible, if the court can see that the defendant was not prejudiced thereby.

---

FROM SUMNER.

---

Appeal in error from the Circuit Court of Sumner county. J. W. JUDD, Sp. J.

T. C. MULLIGAN and W. C. DISMUKES for McAdams.

ATTORNEY-GENERAL LEA for the State.

COOPER, J., delivered the opinion of the court.

Conviction for the larceny of a mule, from which the prisoner has appealed in error.

The mule was taken on the night of July 20, 1880. A few weeks previously another mule had been stolen in the same neighborhood from John Harris. During the June term of the circuit court of the county, Tompkins, one of the witnesses for the State in this casee, was approached by the plaintiff in error, McAdams, and taken out on the balcony of the court-house, where they were alone, and asked if he knew that he (Tompkins) was suspected of stealing Harris' mule. Tompkins replied in the negative, and remarked that those who suspected should come and see him on the subject. Defendant then told Tompkins to send no such word, that it would ruin the whole thing; that there was a good deal of fine stock in his neighborhood, and if properly handled money could be made out of it. Defendant further told Tompkins to say nothing about what had passed between them, and that they had better not be seen together as they might be suspected; that he would see him again or write to him. Tompkins communicated his conversation to Hill, a neighbor of defendant, who advised him to be cautious of defendant, who was a bad fellow and might get him into trouble. Tompkins did not see defendant for several days, nor receive any letter or message from him. In the meantime, Hill, thinking that defendant's proposition to Tompkins meant larceny, went to see Tompkins, who lived seven or eight miles from him,

and arranged with him to go to see the defendant on the succeeding Sunday, and ascertain definitely what he meant.    Tompkins did accordingly visit defendant, stopping at Hill's on the way.    At the interview then had, defendant disclosed to Tompkins that his plan was to steal some of the stock of his neighbors, to be carried south by Tompkins and sold, the proceeds to be divided between them.    Tompkins ostensibly entered into the plan, and the next Tuesday night was fixed upon as the time to move the stock.    The result of the interview was communicated to Hill, who informed some of the neighbors, and it was arranged between them to lie in wait for the defendant.    On Tuesday night, Tompkins went to the defendant's house, and they started together on one of the defendant's horses to steal the stock of some of the neighbors. Two witnesses prove that they saw them that night riding on the horse, the defendant in front, coming from the direction of the defendant's house, and going in the direction of the place of a neighbor named Woodson.    They did go first to the stable of Woodson, but he was on his guard, having been notified of the attempt, and scared them off.    They then started to another neighbor's, passing the prosecutor's lot on the way.    They stopped and looked at prosecutor's stable, and, while there, one of the prosecutor's mules came up to the fence where their horse was hitched, and the defendant caught the mule, put a halter on it which he had brought with him, and led it off. A party of the neighbors, including the prosecutor, had concealed themselves near the defendant's gate.    When

defendant and Tompkins reached the gate, the defendant, who was leading the mule, turned it over to Tompkins, telling him to sell it, and · if he could not get $100 to take $75, and return in about three weeks, when he, defendant, would have several other and better mules for him.    After Tompkins had gone some distance, the concealed party rushed out and caught the defendant.    One of the party asked defendant whose mule that was, and he replied that he had no mule.    He was also asked who the man was that was with him, and he said he did not know him.    One of the witnesses testifies that, on the next day, defendant said to him that if they had not caught him when they did, he does not know how many of the · neighbor's mules he would have stolen.    All of the neighbors present were examined by the State, and each, as well as Tompkins, Hill and Woodson, testified that no inducement was held out by them, or any of them, to the defendant to commit the larceny.    It seems also, from Tompkins' testimony, that he and defendant had not contemplated the taking of any of the · prosecutor's stock.    And the prosecutor himself says that if he had known or supposed that his stock was to be raided, he would have taken steps to prevent it.

Upon the foregoing facts· it is not pretended that the jury were not fully warranted in finding the defendant guilty of the offense charged.    The objection made is to the judge's instruction to the jury.    His Honor, after stating the opposing views of the State and the defendant, said : " If one person agree with another that the latter with a third person shall steal

his, the former's property, this would not be larceny, for larceny cannot be predicated of a taking when a person consents to, or agrees that his property shall be taken. But if, on the other hand, the original design or intent to steal is formed, and the prosecutor should find this out, and agree with another to so arrange matters as that the person who had formed such design to steal should be detected, then if the design to steal, thus formed, be carried out, it would be larceny, although it might be the prosecutor's prop-erty that was taken. If, therefore, you find from the proof that the prosecutor, with others, agreed or ar-ranged with Tompkins that he and defendant should steal his, the prosecutor's mule, among the horses and mules of others, then the defendant would not be guilty and you should acquit him. But, on the other hand, if you find from the proof that the defendant formed a design to steal mules, or horses, and com-municated this design to Tompkins, or if the defendant and Tompkins formed the design and intent to steal horses and mules, and the prosecutor, among others or with others, being informed of this, arranged with the said Tompkins to so conduct matters as that the de-fendant might be detected and caught, then the de-fendant would be guilty, and you should convict him."

To constitute larceny, the possession of the property must be taken against the will of the owner. If, therefore, the owner direct his servant, or other em-ployee, to deliver property to a supposed thief who had not formed the design to steal it, and the latter take it, there would be no larceny, even it seems if

McAdams v. The State.

the taking be with felonious intent: *Kemp* v. *State,* 11 Hum., 320. If, however, the owner suspects that an offense is to be committed, and, instead of taking precautions against it, sets a watch, and detects and arrests the offender, he does not so consent to the taking as to excuse the crime. A man may direct his servant, or a third person to appear to encourage the design of a thief, and lead him on until the offense is complete, so long as he does not induce the original intent, but only provides for its discovery after it has been formed: *Dodge* v. *Brittain,* Meigs, 84. The facts of the present case, as well as the charge of the court, are analogous to those of *Sanders* v. *State,* 3 Leg. Rep., 296. There is certainly no error in the charge, of which the defendant can complain.

The defendant offered O. B. Harris as a witness, and asked him the following question: "Did you or not go to defendant's house a short time before he was arrested, and tell him that your brother, John Harris, had lost a mule, and that Andrew Tompkins and a man by the name of Kirby were suspected as the parties who stole the mule, and request defendant to keep a lookout, and if he could find out anything about the matter to let you know it? If so, did not defendant tell you that he knew Tompkins, but did not know Kirby, and that he would enquire and find out what he could? And was not the Tompkins referred to, the same Tompkins who testified in this case?" The State objected to the question, and the objection was sustained by the court. Error is assigned on this ruling.

Any answer responsive to the question, or series of questions propounded, it is obvious, would have had no relevancy to the issues in the case before the court. The argument is, however, that the conversation might have explained why the defendant first approached Tompkins in the manner deposed to by the latter. But the reason for approaching Tompkins could have nothing to do with the subsequent event, or the acts of the defendant for which he was then on trial. The conversation was irrelevant unless the defendant had proposed to follow it up with evidence coupling it with his acts, or explanatory thereof. No such offer was made. And in the absence of anything else, the expected answer to the question was not only irrelevant, but could not possibly have been of service to the defendant. For if the conversation did induce the defendant to approach the witness Tompkins, it was, perhaps, in view of what did occur, because it led him to think that Tompkins was a party to the theft mentioned, and therefore approachable in the mode adopted.

Upon cross-examination of one of the witnesses for the State, the defendant's counsel asked the witness "if Tompkins was not suspected of stealing Harris' mule?" The witness replied no, but that the defendant was suspected of stealing it. The defendant excepted to the reply after the responsive negation, but the exception was overruled, and the answer went to the jury. Error is assigned on this ruling of the court.

The answer of the witness, in so far as it was ex-

McAdams *v.* The State.

-cepted to, was not responsive to the question, was clearly incompetent and should have been excluded. Does its admission necessarily compel a reversal?

Evidence of another substantive offense than that for which the defendant is on trial, except where it is material to show the intent or motive of the act charged, is inadmissible: *Wilcox* v. *State*, 3 Heis., 110, 116. The testimony in question does not amount to such proof. The trial judge no doubt thought it might tend to explain the conduct of the defendant's neighbors, and the real ground of objection is that it tended to prejudice the defendant by raising a suspicion as to his character for honesty. The rule in this State both in civil and criminal cases is that if incompetent evidence has been received that might have influenced the jury, a new trial will be awarded, for it cannot be seen how far such evidence did influence the jury: *Peek* v. *State*, 2 Hum., 78; *Foster* v. *Jackson*, 8 Baxt., 433. If, however, the evidence, although not strictly admissible, is not of a character to damage the defendant, or, as it has been otherwise expressed, if the court can clearly see that the error has not influenced the result, it is no ground for a new trial: *Draper* v. *State*, 4 Baxt., 254; *Wilson* v. *Smith*, 5 Yer., 381, 409; *Clark* v. *Rhodes*, 2 Heis., 206; *Patterson* v. *Head*, 1 Lea, 664. And it has been decided in criminal cases, where the admissibility of the defendant's confessions was in question, that inasmuch as there was ample proof of the prisoner's guilt, independent of his confession, if there were doubt as to the manner in which it was obtained, the court would not reverse

therefor: *Simpson* v. *State,* 4 Hum., 456; *Wilson* v. *State,* 3 Heis., 244.    Nearly all of the criminal cases which have been reversed for the admission of incompetent testimony in this State, where the verdict might have been sustained on the competent testimony in the record, have been cases in which the guilt was made out by circumstantial evidence, and not direct proof: *Peek* v. *State,* 2 Hum., 78; *Shaw* v. *State,* 3 Sneed, 87; *Grigsby* v. *State,* 4 Baxt., 19.    The case of *Belcher* v. *State,* 8 Hum., 63, is an exception, where the distinction was not made.    The rules of evidence are the same in criminal as in civil cases:   Code, sec. 5376;  1 Gr. Ev., sec. 65.    And, ordinarily, when a prisoner's guilt is made out clearly by positive testimony, it should be no ground for a new trial in this court that evidence was introduced which was not strictly admissible, if the court can see that the defendant was not prejudiced thereby.    It would be otherwise in a case of circumstantial evidence, unless the circumstances were as conclusive as direct testimony.

Affirm the judgment.