**KENTUCKY NATIONAL INSURANCE CO., Plaintiff/Counter–Defendant/Appellant.**

**v.**

**Robert G. GARDNER and, Sandra L. Gardner, Defendants/Counter–Plaintiffs/ Appellees.**

Court of Appeals of Tennessee, at Nashville.

June 11, 1999.

Application for Permission to Appeal Denied by Supreme Court Oct. 18, 1999.

J.R. Slobey, Blackburn, Slobey, Freeman & Happell, P.C., Nashville, for Plaintiff/Counter–Defendant/Appellant.

F. Dulin Kelly, Clinton L. Kelly, Andy L. Allman, Kelly & Kelly, Hendersonville, for Defendants/Counter–Plaintiffs/Appellees.

FARMER, Judge.

Plaintiff Kentucky National Insurance Company appeals the trial court's judgment awarding Defendants/Appellees Robert G. and Sandra L. Gardner the sum of $56,750 under a commercial property insurance policy that Kentucky National previously had issued to the Gardners. The trial court's judgment also awarded the Gardners $14,062.50 in prejudgment interest. We reverse the trial court's judgment based upon our conclusion that the court erred in failing to enforce a provision of the insurance policy which prohibited the Gardners from taking any action after a loss that would impair Kentucky National's subrogation rights.

The Gardners owned a commercial building in Hendersonville, Tennessee, from which they operated a wholesale business. Among other uses, the Gardners used the building to house their inventory, live land hermit crabs, which they sold to retail stores, pet shops, and souvenir resort stores. In late 1994, the Gardners contracted with S.A. Perry Heating and Cooling to install three new HVAC units on the roof of their building. Prior to that time, the building's one HVAC unit was located on the floor of the building. S.A. Perry finished installing the HVAC units on January 2, 1995. On January 4, 1995, the city of Hendersonville experienced a large amount of rainfall. Water collected on the roof of the Gardners' building and entered the building around the new HVAC units, causing substantial damage to both the structure and contents of the building.

The Gardners subsequently learned the cause of the damage to their building. The building's flat roof originally was designed to collect and retain rainwater until it slowly passed through a drain in the back of the building. The weight of the new HVAC units, however, caused depressions in the roof. Instead of draining down the back of the building, the rainwater collected in pools around the HVAC units and entered the building. A portion of the ceiling fell down, including saturated insulation, light fixtures, and a metal brace that supported the ceiling.

After their loss, the Gardners contacted Kentucky National, which previously had issued a commercial property insurance policy on the Gardners' building. As pertinent, the policy provided coverage for

loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused ... by ...

. . . .

4. Weight of people or personal property;

5. Weight of rain that collects on a roof;

6. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

The policy also contained a provision which required the Gardners to "do everything necessary to secure [Kentucky National's subrogation] rights" and to "do nothing after loss to impair them."

In late January 1995, Mike Smith, an adjuster for Kentucky National, visited the building to inspect the damage. By that time, S.A. Perry's insurance carrier had arranged for temporary repairs to be made to the building's roof. Based on this action, Robert Gardner believed that S.A. Perry's insurance carrier would cover the loss, and he conveyed this information to Mike Smith. The Gardners did not have any subsequent contact with Smith.

Contrary to Robert Gardner's belief, S.A. Perry's insurance carrier did not pay for the damage to the building. Instead, in April 1995, S.A. Perry sued the Gardners in General Sessions Court, claiming that the Gardners had not paid for installation of the HVAC units. The Gardners hired an attorney to represent them, and they countersued, claiming that S.A. Perry negligently installed the HVAC units. In August 1995, the General Sessions Court entered a judgment in favor of S.A. Perry in the amount of $9,999.99. The Gardners appealed the judgment to the Circuit Court.

In September 1995, Kentucky National assigned the Gardners' claim to another adjuster, Donnie Cogburn. When he contacted Robert Gardner, Cogburn learned that the Gardners were pursuing a counterclaim against S.A. Perry. Specifically, Robert Gardner told Cogburn that the Gardners had lost their lawsuit in General Sessions Court but that they had appealed the adverse judgment to the Circuit Court. Gardner also told Cogburn that the Gardners had hired an attorney to pursue their counterclaim against S.A. Perry in the Circuit Court. In response, Cogburn indicated that Kentucky National might want to "join" in the litigation.

Cogburn informed Kentucky National of the Gardners' litigation in a report dated September 28, 1995. In his report, Cogburn suggested that Kentucky National instruct its local defense attorney in Nashville to work with the Gardners' attorney to pursue its subrogation claim against S.A. Perry's insurance carrier.

On October 12, 1995, Cogburn sent a handwritten letter to the Gardners informing them that Kentucky National had agreed to pay the sum of $8250 for the damage to the Gardners' building. The letter indicated that, once the Gardners returned a signed and notarized proof of loss, Cogburn then could send the Gardners a check and Kentucky National would "proceed" against S.A. Perry's insurance carrier.

When Kentucky National's attorney, Larry McMillan, learned of the litigation between the Gardners and S.A. Perry, he feared that the lawsuit might impair Kentucky National's subrogation rights. Accordingly, McMillan asked Kentucky National to withhold any payments to the Gardners until he was able to review the claim and speak with the Gardners' attorney. McMillan contacted the Gardners' attorney, Mark Henderson, on January 9, 1996. At that time, Henderson assured McMillan that the Gardners had appealed the General Sessions Court judgment to the Circuit Court and that both S.A. Perry's claim and the Gardners' counterclaim were still pending. McMillan did not take any action on behalf of Kentucky National, but he asked Henderson to send him copies of the pleadings and to keep him updated on the litigation's progress. Despite this request, Henderson subsequently did not inform McMillan of the litigation's progress, and he did not return McMillan's phone calls.

In January 1996, Robert Gardner filed a complaint against Kentucky National with the Tennessee Department of Commerce and Insurance based upon Kentucky National's failure to pay the Gardners' claim. Assistant Division Manager David Hawk responded to the complaint on behalf of Kentucky National. After providing a brief history of the Gardners' insurance claim and their litigation with S.A. Perry, Hawk's letter to the Department of Commerce and Insurance indicated that "[u]pon researching the court file and conversations between Mr. McMillan and Mr. Gardner's attorney, Mark Henderson, it was determined that [Kentucky National's] subrogation was not jeopardized." The letter also indicated that Kentucky National had issued payment to the Gardners in the amount of $8250 on January 29, 1996.

The Gardners received Kentucky National's check for $8250 during the first week of February 1996, and they promptly deposited it. The Gardners sought further

payment from Kentucky National, however, because this amount covered only the temporary repairs that had been made to the building shortly after the loss. The total damage to the building exceeded $110,000, and Kentucky National's policy provided coverage of $65,000.

On April 30, 1996, Larry McMillan learned that the Gardners had permitted their appeal and counterclaim against S.A. Perry to be dismissed with prejudice. The Circuit Court's order, entered on March 1, 1996, indicated that the case was being dismissed due to the Gardners' failure to comply with previous court orders compelling discovery.[1] Thus, the trial court's order dismissing the action operated as an adjudication upon the merits.[2] The order of dismissal became final on May 6, 1996, when the trial court entered an order denying the Gardners' motion to alter or amend the judgment or for a new trial.

Taking the position that the dismissal of the Gardners' lawsuit had impaired its subrogation rights, Kentucky National subsequently filed this action for declaratory relief in which it sought a determination that it owed no further obligation to the Gardners under the insurance policy due to the Gardners' breach of the policy's subrogation provision. In its complaint, Kentucky National also took the position, apparently for the first time, that its policy did not cover the Gardners' loss, that the Gardners had failed to submit a signed, sworn statement of loss, and that the Gardners had failed to comply with the policy's cooperation clause. The Gardners answered the complaint and filed counterclaims seeking declaratory relief, damages, prejudgment interest, and the imposition of a bad faith penalty.[3]

At the conclusion of trial, the trial court entered a judgment awarding the Gard-

ners the sum of $56,750, plus prejudgment interest in the amount of $14,062.50. In support of its judgment, the trial court found (1) that the structural loss to the Gardners' commercial building was covered by the insurance policy issued by Kentucky National, (2) that Kentucky National was estopped from denying coverage because it impliedly waived its right to assert this defense, and (3) that Kentucky National, by its inaction, failed to protect its own subrogation rights. The trial court declined, however, to impose a bad faith penalty against Kentucky National for its refusal to pay the Gardners' claim.

On appeal from the trial court's final judgment, Kentucky National ostensibly has raised fifteen issues for this court's review. In our view, these issues may be distilled into three categories: (1) whether the trial court erred in ruling that Kentucky National's insurance policy covered the Gardners' loss; (2) whether the trial court erred in failing to find that the Gardners materially breached the policy by taking action which impaired Kentucky National's subrogation rights; and (3) whether the trial court erred in ruling that Kentucky National had waived or was estopped from asserting the defenses of coverage and breach of contract.

As an initial matter, we must agree with Kentucky National's contention that the Gardners impaired its subrogation rights by permitting their action against S.A. Perry to be dismissed with prejudice. This court was faced with a similar issue in *Aetna Casualty & Surety Co. v. Tennessee Farmers Mutual Insurance Co.*, 867 S.W.2d 321 (Tenn.App.1993). There, as in the present case, the policy at issue prohibited the insured from taking any action after a loss which would prejudice the

---

**1.** *See* T.R.C.P. 37.02(C) (authorizing trial court to dismiss action as sanction for party's failure to comply with discovery order).

**2.** *See* T.R.C.P. 41.02(3) (providing that, unless otherwise specified, involuntary dismissal operates as adjudication upon merits).

**3.** *See* T.C.A. § 56–7–105(a) (1994) (authorizing trial court to impose penalty of twenty-five percent against insurance carrier which in bad faith refuses to pay covered loss within sixty days after demand).

insurance carrier's subrogation rights. Contrary to this provision, the insured, without the carrier's consent, executed and delivered to the tortfeasor a full and complete release of all claims arising out of the accident in question. The trial court ruled that, by executing the release, the insured destroyed the carrier's subrogation rights. This court affirmed, explaining that

> the policy of insurance contemplate[s] that the insurance carrier shall have all rights of recovery against a tortfeasor that the insured would have up to the amounts paid by the insurer. It seems to logically follow, therefore, that if the insured releases the tortfeasor thus destroying the insurance carrier's subrogation rights, then the insured has ... breached the contract of insurance.... We are of the opinion that in so doing, the insured forfeits any rights of recovery against the insurance carrier.

*Aetna Cas. & Sur. Co.*, 867 S.W.2d at 323 (citation omitted).

■ In the present case, the Gardners did not execute a formal release relieving S.A. Perry of liability for its negligent installation of the HVAC units. Nevertheless, they achieved the same result by permitting their action against S.A. Perry to be dismissed with prejudice due to their failure to comply with the court's prior orders compelling discovery.[4] *See Globe & Rutgers Fire Ins. Co. v. Cleveland*, 162 Tenn. 83, 34 S.W.2d 1059, 1061 (1931) (indicating that insurance carrier's subrogation rights may be lost or destroyed when insured executes release in favor of tortfeasor or when insured pursues lawsuit against tortfeasor such as to exhaust cause of action). Once the Gardners' action was dismissed with prejudice, Kentucky National lost its right to pursue a subrogation claim against S.A. Perry. *See Travelers*

*Ins. Co. v. Williams*, 541 S.W.2d 587, 590 (Tenn.1976). Accordingly, we conclude that the Gardners breached the provision of the insurance policy which prohibited them from taking any action after a loss that would impair Kentucky National's subrogation rights.

■ As a general rule, the Gardners' breach of this policy provision would result in a forfeiture of their rights of recovery under the policy. *Aetna Cas. & Sur. Co.*, 867 S.W.2d at 323. In its final judgment granting the Gardners recovery, however, the trial court ruled that Kentucky National was not entitled to deny payment based upon this provision because, when notified of the pending litigation between the Gardners and S.A. Perry, Kentucky National failed to act to protect its subrogation rights. In effect, the trial court ruled that Kentucky National waived its right to insist upon compliance with the policy's subrogation provision through its own inaction.

■ We conclude that this ruling was in error. An insurance carrier may waive any contractual provision of an insurance policy by the acts, representations, or knowledge of its agents. *Bill Brown Constr. Co. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 13 (Tenn.1991). A waiver is an intentional relinquishment of a known right. *Baird v. Fidelity–Phenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d 384, 389 (1942). The courts of this state repeatedly have held that, in order to constitute an abandonment or waiver of a legal right,

> "there must be a clear, unequivocal, and decisive act of the party showing such a purpose, or acts amounting to an estoppel on [its] part." *Ross v. Swan*, 7 Lea, [75 Tenn. 463] 468. Or, as stated in *Masson v. Anderson*, 3 Baxt. [62 Tenn.

---

4. At trial, Robert Gardner testified that he did not learn of the dismissal of the lawsuit until his present attorney informed him of it. In this regard, however, we must impute the actions and knowledge of the Gardners' previous attorney to the Gardners. *Bellar v. Baptist Hosp., Inc.*, 559 S.W.2d 788, 789 (Tenn.

1978); *Coleman v. Coleman*, 212 Tenn. 258, 369 S.W.2d 557, 560 (1963); *Batchelor v. Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, P.C.*, 828 S.W.2d 388, 394 (Tenn.App.1991); *Winstead v. First Tennessee Bank N.A.*, 709 S.W.2d 627, 632–33 (Tenn. App.1986).

290] 304: "Abandonment or waiver of a right important to parties cannot be made out by uncertain implication, but ought clearly to appear. To constitute such a waiver of a benefit there must be clear, unequivocal, and decisive acts of the party, an act which shows a determination not to have the benefit intended." *Charleston, S.C., Mining & Mfg. Co. v. American Agric. Chem. Co.*, 126 Tenn. 18, 150 S.W. 1143, 1146 (1911); *accord Springfield Tobacco Redryers Corp. v. City of Springfield*, 41 Tenn.App. 254, 293 S.W.2d 189, 198 (1956); *Koontz v. Fleming*, 17 Tenn.App. 1, 65 S.W.2d 821, 825 (1933); *see also Stovall of Chattanooga, Inc. v. Cunningham*, 890 S.W.2d 442, 444 (Tenn. App.1994); *Trice v. Hewgley*, 53 Tenn.App. 259, 381 S.W.2d 589, 595 (1964); *Webb v. Board of Trustees of Webb School*, 38 Tenn.App. 173, 271 S.W.2d 6, 19 (1954).

■ The law will not presume a waiver, and the party claiming the waiver has the burden of proving it by a preponderance of the evidence. *Koontz*, 65 S.W.2d at 825; *see also Springfield Tobacco Redryers*, 293 S.W.2d at 198. Waiver may be proved by "express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive." *Baird v. Fidelity–Phenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d 384, 389 (1942) (quoting *Farlow v. Ellis*, 81 Mass. 229, 231 (1860)). In order to establish waiver by conduct, the proof must show some "absolute action or inaction inconsistent with the claim or right" waived. *Koontz*, 65 S.W.2d at 825; *accord Stovall*, 890 S.W.2d at 444; *Webb*, 271 S.W.2d at 19. Specifically, the record must show conduct on the part of the insurance carrier which is so clearly inconsistent with an intention to insist upon a strict compliance with the provision at issue that the conduct constitutes an implied waiver. *Crumley v. Travelers Indem. Co.*, 225 Tenn. 667, 475 S.W.2d 654, 658 (1972).

■ After carefully reviewing the evidence presented in this case, we conclude that the evidence preponderates against a finding that Kentucky National waived its right to insist upon compliance with the policy's subrogation provision. Upon payment of a loss, an insurance carrier becomes the real party in interest with respect to its subrogation claim. *Travelers Ins. Co. v. Williams*, 541 S.W.2d 587, 590 (Tenn.1976). The carrier has the right to bring an action against the tortfeasor in the carrier's own name or in the name of the insured. *Id.* If the insured has filed an action against the tortfeasor, the carrier also has the right to intervene in that action and to assert its subrogation claim therein. *Id.*

■ In the present case, once Kentucky National made a payment to the Gardners under the insurance policy, it acquired the right to intervene in the pending action between the Gardners and S.A. Perry. We know of no rule of law in this jurisdiction, however, which required Kentucky National to intervene in the pending action in order to protect its subrogation rights. *Cf. Lampton v. Boley*, 870 S.W.2d 428 (Ky.Ct.App.1993) (discussing Kentucky statute which required insurance carrier to assert subrogation rights by intervening in insured's action against tortfeasor). Inasmuch as Kentucky National was permitted, but not required, to intervene in the litigation between the Gardners and S.A. Perry, we conclude that its failure to intervene cannot provide the basis for a finding that it waived its subrogation rights.

In urging this court to affirm the trial court's judgment, the Gardners argue that Kentucky National was required to aid them in the preservation of its subrogation rights. The Gardners cite the decision of *McDonald v. Republic–Franklin Insurance Co.*, 45 Ohio St.3d 27, 543 N.E.2d 456 (1989), wherein the Ohio Supreme Court stated that

[w]hile an insurer may protect its right of subrogation by including a subrogation clause in its policy, such clause does not operate to place the entire burden of protection on the insured. An insurer must aid its insured in the preservation of its subrogation rights.

*McDonald*, 543 N.E.2d at 460.

While we do not dispute this statement of the law, we do not interpret it as requiring Kentucky National to intervene in the ongoing litigation between the Gardners and S.A. Perry. The inaction criticized in *McDonald* was the insurance carrier's failure to respond, within a reasonable time, to a notification by its insured that the tortfeasor's insurer had offered to settle for its full policy limits. At most, the *McDonald* decision merely stands for the proposition that an insurance carrier to whom a settlement offer is communicated by its insured must respond in a timely manner and must indicate (1) whether the settlement offer is acceptable to the carrier and (2) how the insured's acceptance of the offer will affect the carrier's subrogation rights and the insured's right to recover under the policy. *McDonald*, 543 N.E.2d at 458–61.

The *McDonald* decision appears to be consistent with Tennessee cases which suggest that an insurance carrier informed of settlement negotiations by its insured cannot remain silent while the insured continues to pursue her claim against a tortfeasor. In *Rutherford v. Tennessee Farmers Mutual Insurance Co.*, 608 S.W.2d 843, 844 (Tenn.1980), for example, the insurance carrier knew that the insured and her counsel were actively engaged in negotiations with the responsible tortfeasor. Despite this knowledge, the insurance carrier did not object to the insured's pursuit of her claim against the tortfeasor for a period of almost five months. *Rutherford*, 608 S.W.2d at 846. After the insured settled her claim against the tortfeasor, the insurance carrier attempted to deny coverage on the basis of a policy exclusion which prohibited the insured from settling with a tortfeasor without the carrier's written consent. *Id.* at 845. The insurance carrier argued that, by settling without the carrier's consent, the insured had impaired or destroyed the carrier's subrogation rights against the tortfeasor. *Id.* Our supreme court rejected the insurance carrier's arguments, recognizing the well-settled rule that such exclusionary provisions "can be waived, or the carrier can be precluded from reliance thereon, as a result of a course of dealings between it and its insured." *Id.* at 846. The court held that, under the circumstances, the insurance carrier had waived its right to rely on the cited exclusionary provision. *Id.*

The present case is distinguishable from the foregoing decisions, which involved ongoing settlement negotiations of which the insurance carrier was aware. Here, Kentucky National was advised of the existence of the Gardners' litigation with S.A. Perry. Kentucky National was not advised, however, of any settlement negotiations related to the litigation because none apparently had taken place. Moreover, Kentucky National received no information which would have led its representatives to believe that a decision on the merits of the Gardners' claim against S.A. Perry was imminent. Under these circumstances, we hold that neither Kentucky National's silence nor its inaction resulted in a waiver of its subrogation rights under the policy.

■■■■ The Gardners also contend that Kentucky National should be estopped from denying coverage under the policy because the Gardners relied to their detriment upon the representation of adjuster Donnie Cogburn that, after payment of the $8250 to the Gardners, Kentucky National would pursue S.A. Perry and/or its insurance carrier. Courts have recognized a distinction between the concepts of waiver and estoppel:

A waiver is an intentional relinquishment of a known right. An estoppel * * * can be maintained only on the ground that, by the fault of one party, another has been induced * * * to

change his position for the worse in such a manner that it would operate as a virtual fraud upon him to allow the party by whom he has been misled to assert the right in controversy.

*Baird v. Fidelity–Phenix Fire Ins. Co.*, 178 Tenn. 653, 162 S.W.2d 384, 388 (1942) (quoting *Shaw v. Spencer*, 100 Mass. 382, 395 (1868)); *accord Burge Ice Mach. Co. v. Strother*, 197 Tenn. 391, 273 S.W.2d 479, 483 (1954); *Gitter v. Tennessee Farmers Mut. Ins. Co.*, 60 Tenn.App. 698, 450 S.W.2d 780, 784 (1969); *Shelby Mut. Ins. Co. v. Wilson*, 53 Tenn.App. 428, 383 S.W.2d 791, 801 (1964); *Webb v. Board of Trustees of Webb School*, 38 Tenn.App. 173, 271 S.W.2d 6, 19 (1954). Stated another way, "[a] waiver is an intentional relinquishment, while the indispensable elements of an estoppel are ignorance of the party who invokes the estoppel, a representation by the party estopped which misleads, and an innocent and deleterious change of position in reliance on that representation." *Webb*, 271 S.W.2d at 19 (quoting 56 Am.Jur. *Waiver*, at 104). In order to establish an estoppel, also known as an "implied waiver" or "waiver by estoppel," the party asserting it must show that he prejudicially changed his position in reliance upon the other party's conduct. *Gitter*, 450 S.W.2d at 785.

We conclude that the Gardners' estoppel argument is without merit. The evidence was undisputed that Donnie Cogburn represented to the Gardners that Kentucky National's attorney would "join" in the ongoing litigation between the Gardners and S.A. Perry and that Kentucky National would "proceed" against S.A. Perry's insurance carrier. The record contains no proof, however, that Cogburn ever made any representation to the Gardners to the effect that Kentucky National would assume responsibility for pursuing the Gardners' counterclaim against S.A. Perry. At most, Cogburn's representation led the Gardners to believe that Kentucky National's attorney would assist their own attorney in the pursuit of their counterclaim.

The Gardners have neither presented evidence nor alleged that Kentucky National's agents made any representations which would have led the Gardners to believe that they had been relieved of the responsibility for pursuing their counterclaim against S.A. Perry.

In light of our resolution of the foregoing issues, we need not address the remaining issues raised by Kentucky National on appeal. The trial court's judgment is reversed, and this cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the Gardners, for which execution may issue if necessary.

CRAWFORD, P.J., W.S. and HIGHERS, J., concur.