IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 12, 2010 Session

## DONNA SHEDD, ET AL. v. COMMUNITY HEALTH SYSTEMS, INC., ET AL.

Direct Appeal from the Circuit Court for Weakley County
No. 4203     William B. Acree, Jr., Judge

No. W2009-02140-COA-R3-CV - Filed November 12, 2010

Father seeks to intervene in the wrongful death action filed by Mother for the death of the parties' daughter. The trial court found Father waived his right to intervene through inaction. We find the trial court abused its discretion in declaring Father's motion untimely, and therefore, we vacate the order denying Father's motion to intervene, and we remand for further proceedings.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Vacated and Remanded

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Paul A. Bates, Lawrenceburg, Tennessee, for the appellant, Larry Dwayne Woods

Michael G. Sheppard, Matthew E. Wright, Perry A. Craft, Brentwood, Tennessee, for the appellee, Donna Shedd

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Donna Shedd ("Mother") and Larry Woods ("Father") divorced in 1991. On June 20, 2006, the parties' adult daughter, Jodi Woods ("Daughter"), presented to the Volunteer Community Hospital emergency room complaining of a severe headache, sensitivity to light, neck pain, and severe anxiety. Four days later she died from meningococcal meningitis and encephalopathy.

On June 14, 2007, Mother filed a complaint for wrongful death based on medical malpractice against Volunteer Community Hospital and David Oruma, M.D.[1] Prior to the conclusion of a two-week jury trial from June 22, 2009 to July 7, 2009, a confidential settlement was reached with Dr. Oruma, who was dismissed with prejudice on July 2, 2009. On July 7, 2009, the jury returned a verdict in favor of Volunteer Community Hospital.

On July 16, 2009, Father filed a motion to intervene, seeking an equal division of the settlement proceeds. Following an evidentiary hearing on September 3, 2009, the trial court entered an order denying Father's motion to intervene:

> The Court finds that Mr. Woods has waived any rights he may have to participate in this suit or to share in the proceeds because of his inaction.
>
> The record reflects that following the death of his daughter, Mr. Woods did absolutely nothing about any potential claim he might have. He did not seek legal advice nor did he consult with Ms. Shedd. The Court also finds that it is inconceivable that Mr. Woods had no knowledge about the filing of the wrongful death claim. There was extensive pretrial publicity about the death of Miss Woods and, also, about the filing of the suit. The Court finds that Mr. Woods waited until the matter was concluded before making his claim thereby allowing him to avoid the expense and effort in bringing this case to conclusion. [footnote omitted] Therefore, the motion to intervene is denied.

Father appeals.

---

[1]Mother's complaint and amended complaint also named as defendants Community Health Systems, Inc., Community Health Systems Professional Services Corporation, CHS/Community Health Systems, Inc., Community Health Investment Corporation, CHS Holdings Corporation, Firstcare Medical Center, P.C., and Shani Edge, R.N. A final order was entered as to these defendants on August 5, 2008.

## II.  ISSUE PRESENTED

Appellant presents the following issue for review, summarized as follows:

1.    Whether the trial court erred in denying Father's motion to intervene.


## III.  STANDARD OF REVIEW

In his motion to intervene, Father cites generally to Tennessee Rule of Civil Procedure 24.  However, he states that he seeks to intervene as a party plaintiff "in that he claims an interest in the subject matter of this action and is so situated that the disposition of this cause absent a ruling concerning distribution of the settlement proceeds . . . will impair his ability to protect his interest."  Our standard for reviewing the denial of a motion to intervene as of right, pursuant to Tennessee Rule of Civil Procedure 24.01, is *de novo*, with the exception of the application's timeliness, which is reviewed under an abuse of discretion standard.  ***State v. Brown & Williamson Tobacco Corp.***, 18 S.W.3d 186, 191 (Tenn. 2000) (citation omitted).  "An abuse of discretion exists when the reviewing court is firmly convinced that the lower court has made a mistake in that it affirmatively appears that the lower court's decision has no basis in law or in fact and is therefore, arbitrary, illogical, or unconscionable."  ***Id.*** (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996); *State v. Carter*, 890 S.W.2d 449, 454 (Tenn. Crim. App. 1994)).


## IV.  DISCUSSION

As we noted above, the trial court denied Father's motion to intervene, finding that he "waited until the matter was concluded before making his claim thereby allowing him to avoid the expense and effort in bringing this case to conclusion."  "The timeliness of an intervention is governed by equitable principles, and is determined by the facts and circumstances of each particular case. . . consider[ing] the following factors:

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervener knew or reasonably shown have known of his interest in the case; (4) the prejudice to the original parties due to the proposed intervener's failure after he knew or reasonably should have known of his interest in the case to apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Am. Materials Techs., LLC v. City of Chattanooga*, 42 S.W.3d 914, 916 (Tenn. Ct. App. 2000) (citing *Velsicol Chem. Corp. v. Enenco, Inc.*, 9 F.3d 524, 531 (6th Cir. 1993); *Triax Co. v. TRW, Inc.*, 724 F.2d 1224, 1228 (6th Cir. 1984)).

Specifically, the trial court found that Father's inaction constituted a waiver. *See generally Foster v. Jeffers*, 813 S.W.2d 449, 453 (Tenn. Ct. App. 1991) (stating that a spouse, through inaction, can waive his right to bring a wrongful death action). "'[W]aiver is a voluntary relinquishment by a party of a known right[;]'" *Reed v. Washington County Bd. of Educ.*, 756 S.W.2d 250, 255 (Tenn. 1988) (quoting *Chattem, Inc. v. Provident Life & Accident Ins. Co.*, 676 S.W.2d 953, 955 (Tenn. 1984)), "'[i]t concedes a right, but assumes a voluntary relinquishment of it.'" *Collins v. Summers Hardware & Supply Co.*, 88 S.W.3d 192, 201 (Tenn. Ct. App. 2002) (quoting *Gitter v. Tennessee Farmers Mut. Ins. Co.*, 450 S.W.2d 780, 784 (Tenn. Ct. App. 1969)). "If an individual does not know of his rights or if he fails to understand them he cannot waive those rights." *Reed*, 756 S.W.2d at 255 (citing *Faught v. Estate of Faught*, 730 S.W.2d 323, 326 (Tenn. 1987)).

Waiver may be either express or implied. *Reed*, 756 S.W.2d at 255. "An express waiver is an oral or written statement giving up known rights or privileges." *Grimsley v. Kittrell*, No. M2005-02452-COA-R3-CV, 2006 WL 2846298, at *3 (Tenn. Ct. App. Sept. 29, 2006). "An implied waiver occurs when a party's conduct, although perhaps not the party's words, shows the party's conscious choice to give up rights or to forego benefits." *Id.* (citing *Hoefler v. Hoefler*, No. M1998-00966-COA-R3-CV, 2001 WL 327897, at *4 (Tenn. Ct. App. Apr. 5, 2001)). To constitute the waiver of a legal right

> there must be a clear, unequivocal, and decisive act of the party showing such a purpose, or acts amounting to an estoppel on [its] part. Abandonment or waiver of a right important to parties cannot be made out by uncertain implication, but ought clearly to appear. To constitute such a waiver of a benefit there must be clear, unequivocal, and decisive acts of the party, an act which shows a determination not to have the benefit intended.

*Kentucky Nat. Ins. Co. v. Gardner*, 6 S.W.3d 493, 498-99 (Tenn. Ct. App. 1999) (quoting *Charleston, S.C., Mining & Mfg. Co. v. American Agric. Chem. Co.*, 150 S.W. 1143, 1146 (Tenn. 1911)) (internal and external citations omitted). "In order to establish waiver by conduct, the proof must show some 'absolute action or inaction inconsistent with the claim or right' waived." *Id.* (quoting *Koontz v. Fleming*, 65 S.W.2d 821, 825 (Tenn. Ct. App. 1933)).

"[I]t is well-settled than an implied waiver will not be presumed." ***BMG Music v. Chumley***, No. M2007-01075-COA-R9-CV, 2008 WL 2165985, at \*5 (Tenn. Ct. App. May 16, 2008). Instead, "[t]he party claiming a waiver has the burden of proving it by a preponderance of the evidence." ***Meeks v. Successor Trustees of Marital Trust***, No. W2009-02016-COA-R3-CV, 2010 WL 3420546, at \*9 (Tenn. Ct. App. Sept. 1, 2010) (citing *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998)). The party asserting waiver must prove that the party against whom waiver is asserted has, "'by a course of acts and conduct, or by so neglecting and failing to act, . . . induce[d] a belief that it was [the party's] intention and purpose to waive.'" ***BMG Music***, 2008 WL 2165985, at \*5 (citing *Kentucky Nat. Ins. Co.*, 6 S.W.3d at 499). A party asserting implied waiver must also show that he "'prejudicially changed his position in reliance upon the other party's conduct.'" ***Id.*** (citing *Kentucky Nat. Ins. Co.*, 6 S.W.3d at 501); *see also Gitter*, 450 S.W.2d at 785.

On appeal, Father asserts two reasons why waiver cannot be found in this case: he had no knowledge of his rights and, even assuming knowledge, there is no evidence that Mother prejudicially changed her position based on Father's conduct. Mother, however, contends that the trial court's finding–that it was "inconceivable" that Father had no knowledge of Mother's lawsuit–was a credibility determination to which this Court should defer.[2]

At the hearing, Father claimed that he learned of Daughter's hospitalization through her teacher, and he acknowledged visiting her there. He further acknowledged that after her death he did not seek legal advice about the possibility of filing a lawsuit; however, he

---

[2]The testimony presented at the evidentiary hearing on Father's motion to intervene focused primarily on the parties' relationship with Daughter and Father's payment/non-payment of child support, life insurance, and educational expenses. Father testified that following his divorce from Mother in 1991, he exercised regular visitation with Daughter until 1996 when his relationship with Mother deteriorated. After 1996, Daughter only visited him "every now and then[,]" and since turning eighteen in 2001, Daughter had visited his home "[p]robably a dozen or so times" over a period of "[p]robably about four years." Mother, however, testified that she was awarded custody of Daughter in the divorce, and that she had provided for Daughter's insurance, educational, and "other" expenses. The parties stipulated that Father owed no child support arrearage, however, Mother claimed that Father did not make a "good faith effort to pay one-half" of Daughter's college expenses nor did he maintain life insurance, as required by the MDA. He admitted that he let the life insurance coverage lapse in 2005 when he lost his job, and that he did not pay anything towards Daughter's college education because he "had no money to pay."

At the hearing, Mother implied that Father's failure to comply with the requirements of the MDA, along with his limited contact with Daughter, prevented him from recovering through a wrongful death action. The trial court did not rely upon this argument in dismissing Father's petition, and the parties do not address it on appeal. Therefore, we will not address this issue on appeal.

contended that did not know such possibility existed. Specifically, when asked whether he was "aware of the facts and circumstances surrounding [Daughter's] death[,]" Father answered, "I knew she had bacterial meningitis. Where she picked it up or anything else, I don't know[.]" Furthermore, he answered "no" when asked whether Mother had made him "aware of what happened to [Daughter] to cause her death[,]" or whether Mother "ever call[ed] and discuss[ed] those circumstances with [him]."

Father testified that neither Mother nor her attorney contacted him about participating in the lawsuit. In fact, he claimed that he did not learn of Mother's lawsuit until more than two years after its filing, when "at the first of July [2009]" he heard the case discussed on the Lawrenceburg radio news. The following day, he claimed, he contacted an attorney regarding possible participation in the lawsuit. With respect to publicity, the following exchanges were made at the hearing:

[Wife's Counsel]: You mentioned listening to the radio. I take it you had access to a radio back in 2006; is that correct?

[Father]: Probably did.

[Mother's Counsel]: Okay. And you live out in Summertown; is that correct?

[Father]: Yes, sir.

[Mother's Counsel]: And the Lawrenceburg newspaper is circulated in that area, I take it?

[Father]: Yes, sir.

[Mother's Counsel]: And you had access to the Lawrenceburg newspaper that circulated in that area; is that correct?

[Father]: That's in the area.

[Mother's Counsel]: And are you familiar with an organization called the Associated Press or otherwise known as the AP, it's a news wire?

[Father]: No, I'm not familiar.

[Mother's Counsel]: And you're aware that news broke . . . through the Associated Press news wire, which is a national organization, on October 17, 2006, and that WSMV ran a news story in addition to that on October 17, 2006 about the lawsuit that had been filed by Donna Shedd against Martin Hospital Corporation and Dr. Oruma; isn't that correct?

[Father]: Sir, here's what I got to say on that. I work -- I say -- no. I work at Delphi? I work 12 hours a day, every day except for Saturday and Sunday. And it's a one hour trip -- an hour and a half trip to it. It's an hour and a half trip back. My days turn into 15 hours. By the time I woke up, took me a shower, I was getting back to work after I slept.[3]

[The Court]: Mr. Woods, did you answer, no, you did not know about the news coverage?

[Father]: No, sir, I did not know.

. . . .

[Mother's Counsel]: But you did have access to a TV and to a radio and to a newspaper?

[Father]: I sure did if I had time to look at it, and I very seldom did.

[Mother's Counsel]: And there have been multiple stories run about this lawsuit at that time; is that right?

[Father]: I don't know about that. I didn't catch it.

---

[3]Father testified that he currently lives and works in Saginaw, Michigan, but still owns a home in Lawrence County, which he visits when he is on vacation from his Michigan job. No testimony was elicited regarding when Father moved to Michigan.

. . . .

[Mother's Counsel]: When the news story broke about filing the lawsuit for the death of Jodi Woods you made a phone call shortly after that to Ms. Dawn Woods[, your other daughter]; is that correct?

[Father]: She has blocked my number. I did talk to Jodi one time, and then she blocked the number.

[Mother's Counsel]: You called Dawn Woods after the news story broke; isn't that correct?

[Father]: No.

[Mother's Counsel]: In October of 2007?

[Father]: No.

[Mother's Counsel]: Okay. You're denying under oath today of that telephone conversation with Dawn Woods.

[Father]: I talked to Jodi, but I didn't know nothing about no lawsuit.

[Mother's Counsel]: Sir, you're aware that . . . Jodi Woods died in June of 2006; is that correct?

[Father]: Right.

[Mother's Counsel]: I'm talking about October of 2007 when the Associated Press ran multiple news stories on WSMV Channel 4, which is available in Lawrenceburg, correct?

[Father]: Right.

[Mother's Counsel]: And Associated Press, through its news wire and several news publications ran news stories shortly after that in October of 2007, you called Dawn Woods, who is Jodi's sister, is that correct?

[Father]: Now, I could have.

In finding "extensive pretrial publicity[,]" and thus, that "it [was] inconceivable that Mr. Woods had no knowledge about the filing of the wrongful death claim[,]" the trial court apparently relied upon statements made by Mother's counsel, as neither testimony nor exhibits evidencing publication were offered. This was improper, as "an attorney's statements during a trial are not evidence to be considered by the court." *Houston v. Houston*, No. W2002-02022-COA-R3-CV, 2003 WL 22326970, at *10 (Tenn. Ct. App. May 29, 2003).

Without evidence of publication to support the trial court's finding of knowledge and strategic delay, we find that the trial court abused its discretion in declaring Father's motion to intervene untimely. Furthermore, insofar as the trial court's knowledge finding was a credibility determination, we find clear and convincing evidence to the contrary. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted). Again, no evidence of publication was presented at the hearing, and Father offered uncontroverted testimony that he was unaware of circumstances warranting the filing of a lawsuit, that he did not learn of Mother's lawsuit until July 2009, and that he contacted an attorney immediately after learning of the suit. Moreover, at the hearing, Mother offered no testimony regarding prejudice to her, and in her appellate brief she states only that "Larry Woods' failures and delays prejudiced Appellee Donna Shedd. She alone was required to bear these burdens, struggle through the ordeal, and carried the weight." Based on the factors regarding timely intervention as well as the elements of waiver, we find that the trial court abused its discretion in denying Father's motion to intervene. The order of denial is vacated, and the case remanded for further proceedings.

## IV. CONCLUSION

For the aforementioned reasons, we vacate the order denying Father's motion to intervene, and we remand for further proceedings. Costs of this appeal are taxed to Appellee, Donna Shedd, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.